PEOPLE v. VICTOR.

1. CONSTITUTIONAL LAW—STATUTES PRESUMED TO BE CONSTITUTIONAL UNTIL CONTRARY SHOWN.
   A statute will be presumed constitutional until the contrary is shown.

2. SAME—PARTS OF STATUTES.
   An entire statute will not be declared unconstitutional because one part is void, if the balance of the act will be effective.

3. SAME—STATUTES—UNFAIR TRADE PRACTICES.
   On appeal from conviction under statute whose title stated it was "to prevent unfair discrimination, unfair methods of competition and destructive trade practices in the production, manufacture, distribution or sale of bakery products or petroleum products," the statute is assumed not to be a price-fixing measure and unconstitutional, but solely prohibitive of allegedly unfair trade practices (Act No. 282, Pub. Acts 1937).

4. SAME—RIGHT TO ENGAGE IN BUSINESS.
   The right to engage in any business not harmful to the public is guaranteed by the Constitution.

5. SAME—PROHIBITION OF BUSINESS PRACTICES—DUE PROCESS.
   A business practice which has no detrimental effects to the public health, morals, safety and general welfare may not be prohibited by the legislature without resulting in a deprivation of property and liberty without due process of law.

6. SAME—PUBLIC WELFARE, HEALTH, MORALS AND SAFETY.
   The constitutional right to engage in business is subject to such regulation as may be necessary to the public welfare, health, morals and safety.

7. COURTS—SUPREME COURTS—UNITED STATES—STATE.
   While the Federal supreme court is the final judge of violations of the Federal Constitution, the decision of the Supreme Court of a State is final on the question of whether or not a State statute conflicts with the State Constitution.

8. CONSTITUTIONAL LAW—DESTRUCTIVE TRADE PRACTICE—LEGISLA-
TURE—COURTS.

The mere fact that the legislature labels the giving of a premium
with the sale of gasoline a destructive trade practice does not
make it such nor render the practice subject to prohibition
unless the practice, as a matter of fact, bears a reasonable
relationship to the public health, safety, morals and general
welfare, and the determination as to the existence of such a
relationship is a matter within the power of the courts (Act
No. 282, § 6, Pub. Acts 1937).

9. CRIMINAL LAW—PREMIUMS GIVEN WITH PETROLEUM PRODUCTS—
EVIDENCE—ADULTERATION OF PRODUCTS—FRAUD.

In criminal prosecution under statute prohibiting the giving of
premiums with the sale of petroleum products, claim by prose-
cution that dealer who gives a premium is more inclined, for
that reason, to adulterate his product or to give short measure
*held*, not sustained by evidence introduced, nor is showing
made that public is deceived into buying inferior gasoline by
the offering of a premium or that there is a logical connection
between the practice of giving a premium and a tendency to
defraud the public (Act No. 282, Pub. Acts 1937).

10. CONSTITUTIONAL LAW—PUBLIC WELFARE—PREMIUMS UPON SALES
OF GASOLINE.

Since motorists buy only as much gasoline as they need, regard-
less of inducements, a dealer who offers premiums of drinking
glasses upon sales of five gallons thereof cannot be said to
be offering a ''lure to improvidence'' so as to fall within the
pale of protection of the public afforded by the Constitution
(Act No. 282, § 6, Pub. Acts 1933).

11. SAME—SALE OF GASOLINE—PREMIUMS—PRICE WARS—STATUTES.

While a price war between dealers in gasoline does tend to have
undesirable results and the prevention of same might be a
basis of valid regulation of retail gasoline sales by the legis-
lature, it does not follow that enforcement of a statute
prohibiting the giving away of any commodity for the pur-
pose of promoting the production, manufacture, distribution
or sale of gasoline, because it constitutes a destructive trade
practice, will have the effect of preventing such price wars
(Act No. 282, § 6, Pub. Acts 1933).

12. SAME—PREMIUMS—SALE OF GASOLINE—USE IN PUBLIC SERVICE
VEHICLES.

In prosecution for violation of statute prohibiting the giving
of commodity premiums upon sale of gasoline, claim that

prohibition thereunder is valid because gasoline is used in ambulances, police patrols and other vehicles in public service *held*, without merit (Act No. 282, § 6, Pub. Acts 1933).

13. SAME—PREMIUMS—SALE OF GASOLINE—PRICE WARS—STATUTES —PRICE-FIXING—PUBLIC HEALTH, MORALS, SAFETY AND WELFARE. Any tendency that the giving of premiums with the sale of gasoline might have towards promoting a price war *held*, not an evil sought to be eliminated by legislature in statute prohibiting the giving of premiums in connection with the sale in view of the fact that the statute is not a price-fixing statute; hence, the statute does not establish a ban on an improper method of competition and is unconstitutional, there being no reasonable relationship between the prohibition and the protection of the public health, morals, safety and welfare (Const. 1908, art. 2, § 16; Act No. 282, § 6, Pub. Acts 1933).

POTTER and MCALLISTER, JJ., dissenting.

Appeal from Recorder's Court of the City of Detroit; Maher (John J.), J. Submitted June 16, 1938. (Docket No. 101, Calendar No. 40,113.) Decided February 2, 1939.

Harry Victor was convicted of giving premiums with sale of gasoline. Reversed and defendant discharged.

*Percy J. Donovan*, for appellant.

*Raymond W. Starr*, Attorney General, *Duncan C. McCrea*, Prosecuting Attorney, and *William L. Brunner, Asher L. Cornelius*, and *Paul B. Mayrand*, Assistant Prosecuting Attorneys, for the people.

*Goodenough, Voorhies, Long & Ryan, amici curiæ.*

BUTZEL, C. J. Defendant, an independent dealer operating a gasoline station in the city of Detroit, was convicted of violation of Act No. 282, Pub. Acts 1937 (Comp. Laws Supp. 1937, § 9829–11 *et seq.*, Stat. Ann. 1938 Cum. Supp. § 28.78[1] *et seq.*). The particular offense charged was that on the sale of

five gallons of gasoline at 18.6 cents per gallon, a price at least equal to that generally prevailing, he gave away, as a premium to a cash customer, a drinking glass worth less than five cents, with the intention of injuring or destroying his competitors.

Act No. 282, Pub. Acts 1937, is entitled:

"An act to prevent unfair discrimination, unfair methods of competition and destructive trade practices in the production, manufacture, distribution or sale of bakery products or petroleum products; to provide civil remedies and proceedings for the enforcement of this act; to define the duties of the attorney general with regard thereto; and to provide penalties for the violation of this act."

Section 6 of the act provides:

"Any person, doing business in this State and engaged in the production, manufacture, distribution or sale of bakery products or petroleum products, who shall, with the intent to injure or destroy a competitor, give, offer to give or advertise the intent to give away any commodity for the purpose of promoting the sale of any other commodity, shall be deemed guilty of a destructive trade practice, which is hereby prohibited and declared to be unlawful."

At the trial, it was shown by the prosecution that defendant had issued circulars advertising the giving of a premium, and that the regular customers of some other dealers had made purchases from defendant in order to secure premiums; that the market for the sale of gasoline at retail is a limited one so that only an amount certain is sold; that the giving of a premium, while amounting to a reduction in the retail price, does not result in an increase in the total amount of gasoline consumed; and that an increase of business at one station results in a loss of business by competing stations, with consequent injury to the latter.

Defendant testified that he purchased the gasoline of the specifications he required at the lowest price for which he could obtain it and from whatever source he could secure it on the open market. It was shown that he did not have the benefit of the wide advertising enjoyed by the dealers in nationally known brands, who, by means of radio, magazines and newspapers, claimed superior merit for their products; and that in order to offset such advantages, he gave away premiums. Attention was called to the fact that large stations handling well known brands provide rest rooms with modern facilities, and furnish, without charge, the services of attendants who clean customers' windshields, fill radiators and batteries with water and tires with air, thus giving them, at some expense, something in addition to gasoline for the price of the latter. Defendant testified that he gave premiums solely for the purpose of promoting sales in order to make a livelihood and that he had no intention of injuring or destroying a competitor.

Defendant moved that the information be quashed and also that a verdict of not guilty be directed on the grounds that the act was unconstitutional, and that the intent to injure or destroy a competitor had not been proved beyond a reasonable doubt. The judge, who tried the case without a jury, denied the motion and found defendant guilty. The latter appeals.

While it is the province of the jury, or the judge acting as a jury, to determine the intent from all of the surrounding facts, can it be said from the evidence that the giving away of a glass worth less than five cents, under the circumstances, shows beyond a reasonable doubt an intent to injure or destroy a competitor? Merely to ask the question almost calls for the answer, "No," but we prefer to base our

opinion on broader grounds inasmuch as other cases have arisen throughout the State and a determination of the constitutionality of this section of the law is highly desirable.

Defendant assails the constitutionality of section 6 of the act, under which he was convicted, and also the constitutionality of the act as a whole. We are mindful of the fact that the constitutionality of an act will be presumed until the contrary is shown, and that an entire statute will not be declared unconstitutional because one part is void, if the balance of the act will be effective. The act itself contains a severability clause so often found in recent legislative enactments. We shall, therefore, but briefly refer to the nature of the statute as a whole and limit our main discussion to section 6.

While the purpose of the act may be to prevent the creation of a monopoly by one dealer who seeks to drive out all of his competitors by means of unfair and ruinous competitive practices, to the detriment of the public, nevertheless, the act does savor of an attempt to stifle competition by maintaining the prices and profits of those dealers already in the business. Defendant claims that the act is a price-fixing measure and relies on *Williams* v. *Standard Oil Co. of Louisiana,* 278 U. S. 235 (49 Sup. Ct. 115, 60 A. L. R. 596), which held that the business of selling gasoline was not affected with a public interest so as to permit statutory regulation of retail prices. The prosecution contends, on the other hand, that the statute is not a price-fixing measure, but merely prohibits certain unfair trade practices. In view of our decision as to the validity of section 6, it is unnecessary to decide the question, and in our discussion of that section, we shall assume that the act is not a price-fixing measure, but is solely prohibitive of allegedly unfair trade practices, as contended by the prosecution.

Defendant claims that Act No. 282, § 6, Pub. Acts 1937, is unconstitutional because it results in a deprivation of property and liberty without due process of law, the prohibition of the giving of premiums being outside of the police power.

The right to engage in any business not harmful to the public is guaranteed by the Constitution. *Carolene Products Co.* v. *Thomson,* 276 Mich. 172. Consequently, if the giving of a premium with the sale of gasoline is a legitimate business practice, with no detrimental effects to the public health, morals, safety and general welfare, the practice may not be prohibited by the legislature and a statute doing so results in a deprivation of property and liberty without due process of law. On the other hand, it is clear that any business or business practice may be regulated if such regulation is necessary to the public welfare, health, morals and safety. *Carolene Products Co.* v. *Thomson, supra; Nebbia* v. *New York,* 291 U. S. 502 (54 Sup. Ct. 505, 89 A. L. R. 1469); *Great Atlantic & Pacific Tea Co.* v. *Grosjean,* 301 U. S. 412 (57 Sup. Ct. 772, 112 A. L. R. 293).

Many cases have held that the giving of premiums or trading stamps with the purchase of commodities is a legitimate business practice which is protected by the due process clause. *Long* v. *State,* 74 Md. 565 (22 Atl. 4, 12 L. R. A. 425, 28 Am. St. Rep. 268); *In re Opinion of the Justices to the House of Representatives,* 208 Mass. 607 (94 N. E. 848); *People* v. *Gillson,* 109 N. Y. 389 (17 N. E. 343, 4 Am. St. Rep. 465); *State* v. *Caspare,* 115 Md. 7 (80 Atl. 606); *State* v. *Dalton,* 22 R. I. 77 (46 Atl. 234, 48 L. R. A. 775, 84 Am. St. Rep. 818); *State* v. *Ramseyer,* 73 N. H. 31 (58 Atl. 958, 6 Ann. Cas. 445); *State* v. *Lothrops-Farnham Co., Inc.,* 84 N. H. 322 (150 Atl. 551); *State* v. *Dodge,* 76 Vt. 197 (56 Atl. 983, 1 Ann.

Cas. 47); *O'Keeffe* v. *City of Somerville*, 190 Mass. 110 (76 N. E. 457, 112 Am. St. Rep. 316, 5 Ann. Cas. 684); *In re Opinion of Justices to the Senate*, 226 Mass. 613 (115 N. E. 978); *State, ex rel. Simpson*, v. *Sperry & Hutchinson Co.*, 110 Minn. 378 (126 N. W. 120, 30 L. R. A. [N. S.] 966); *Ex parte McKenna*, 126 Cal. 429 (58 Pac. 916); *Ex parte Drexel*, 147 Cal. 763 (82 Pac. 429, 2 L. R. A. [N. S.] 588, 3 Ann. Cas. 878); *City and County of Denver* v. *Frueauff*, 39 Col. 20 (88 Pac. 389, 7 L. R. A. [N. S.] 1131, 12 Ann. Cas. 521); *Denver* v. *United Cigar Stores Co.*, 68 Col. 363 (189 Pac. 848); *United Cigar Stores Co.* v. *People*, 68 Col. 546 (190 Pac. 1117); *Young* v. *Commonwealth*, 101 Va. 853 (45 S. E. 327); *City Council of Montgomery* v. *Kelly*, 142 Ala. 552 (38 South. 67, 70 L. R. A. 209, 110 Am. St. Rep. 43); *State, ex rel. Hartigan*, v. *Sperry & Hutchinson Co.*, 94 Neb. 785 (144 N. W. 795, 49 L. R. A. [N. S.] 1123); *Sperry & Hutchinson Co.* v. *City of Owensboro*, 151 Ky. 389 (151 S. W. 932, Ann. Cas. 1915A, 373); *People, ex rel. Appel*, v. *Zimmerman*, 102 App. Div. 103 (92 N. Y. Supp. 497); *People, ex rel. Madden*, v. *Dycker*, 72 App. Div. 308 (76 N. Y. Supp. 111). However, the Supreme Court of the United States has held that the giving of premiums or trading stamps with the purchase of merchandise is subject to prohibition by the legislature under the police power. *Rast* v. *Van Deman & Lewis Co.*, 240 U. S. 342 (36 Sup. Ct. 370, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455); *Tanner* v. *Little*, 240 U. S. 369 (36 Sup. Ct. 379); *Pitney* v. *Washington*, 240 U. S. 387 (36 Sup. Ct. 385). In the case of *People, ex rel. Attorney General*, v. *Sperry & Hutchinson Co.*, 197 Mich. 532 (L. R. A. 1918A, 797), *quo warranto* proceedings were brought to oust the defendant trading stamp company from doing business in Michigan in violation of the provisions of Act

No. 244, Pub. Act 1911 (3 Comp. Laws 1915, § 15055, *et seq.*). That statute prohibited the giving of trading stamps other than for redemption directly by the firm issuing them. The holding of the United States supreme court in *Rast* v. *Van Deman & Lewis Co.*, *supra*, and its companion cases was conceded for the purposes of the opinion, the Michigan statute being declared invalid on other grounds. The validity of a statute such as is here involved was not determined.

Although the United States supreme court has held that a State statute prohibiting the giving of trading stamps does not violate the Fourteenth Amendment of the Federal Constitution, article 2, § 16, of the Michigan Constitution is also a limitation on the power of the State Legislature. And while the Federal supreme court is the final judge of violations of the Federal Constitution, the decision of the Supreme Court of this State is final on the question of whether or not a State statute conflicts with the State Constitution. In the cases of *In re Opinion of the Justices to the Senate,* 226 Mass. 613 (115 N. E. 978) and *State* v. *Lothrops-Farnham Co., supra,* the supreme courts of Massachusetts and New Hampshire refused to follow the decisions of the United States supreme court and held that the giving of trading stamps could not be prohibited. While the decisions of the Federal court are of weight and should be considered, this court is nevertheless free to determine for itself whether or not Act No. 282, § 6, Pub. Acts 1937, violates article 2, § 16 of the Michigan Constitution.

The mere fact that the legislature labels the giving of a premium with the sale of gasoline a "destructive trade practice," does not make it such nor render the practice subject to prohibition. While there is a

presumption that an act of the legislature is valid, nevertheless, the courts have the power to determine whether, as a matter of fact, the prohibition bears a reasonable relationship to the public health, safety, morals and general welfare. *Carolene Products Co. v. Thomson, supra.*

There is no claim that the giving of a water glass with five gallons of gasoline constitutes a lottery or any form of gambling. The prosecution attempted to show that a dealer who gives a premium is more inclined, for that reason, to adulterate his product or to give short measure. No evidence was introduced to prove the contention and there is no logical connection between the practice of giving a premium and a tendency to defraud the public. Nor is there any showing that the public is deceived into buying inferior gasoline by the offering of a premium. If any dealer sells inferior gasoline, his customers will discover the fact at once, premium or no premium, and the dealers handling nationally known brands will retain their business not only through their advertising, but by selling a meritorious and satisfactory product. The case of *Seifert* v. *Buhl Optical Co.,* 276 Mich. 692, may be distinguished on the ground that the health and eyesight of the public was involved and that the means of advertising used would likely have led to acceptance of detrimentally inferior professional services.

The United States supreme court predicated its decision in *Rast* v. *Van Deman & Lewis Co., supra,* on the finding that the giving of premiums might be a ''lure to improvidence,'' and for that reason could be prohibited in protection of the public. However, the prosecution contends that the market for the retail sale of gasoline is inelastic and that the giving of premiums will not cause motorists to buy more

gasoline, but will merely cause them to transfer their trade to the dealer who offers premiums. Since motorists buy only as much gasoline as they need, regardless of inducements, there clearly can be no "lure to improvidence."

The prosecution finally contends that the giving of premiums by one dealer provokes a contest between all dealers to give larger and more valuable premiums or to cut prices, and that such a price war demoralizes the industry, to the consequent injury of the public. It is claimed that a price war may result in violence and lawlessness, with injury to person and property. This may be prevented by proper performance of their duties on the part of police and prosecutor. Nor are we impressed with the claim by the prosecution that because ambulances, police patrols and other vehicles in public service use gasoline, the giving of premiums should be prohibited. However, a price war does tend to have undesirable results, and assuming, but not deciding, that a tendency towards a price war might be a basis of valid regulation of retail gasoline sales by the legislature, it does not follow that enforcement of section 6 of the statute will have the effect of preventing such price wars.

In order that destructive competition by cutting prices might be eliminated, it would be necessary that some minimum price be fixed, below which a dealer may not sell gasoline. If, as the prosecution claims, the statute makes no attempt to set a fixed minimum price equally applicable to all dealers without regard to particular circumstances, then defendant could sell his gasoline at 20 cents a gallon or at 14.6 cents, and not violate the act, as long as he does not give a premium or sell below cost. If defendant may legally sell his gasoline at 14.6 cents a gallon, without giving a premium, the tendency

towards a price war would be no less than it was when he sold at 18.6 cents a gallon and gave a premium worth a fraction of a cent a gallon. It is obvious that if we assume that the act is not a price-fixing measure, we must conclude that the aim of the legislature in enacting the statute was not to prevent price wars. Any tendency that the giving of premiums might have towards promoting a price war is not an evil sought to be eliminated by the legislature.

It is true that only those practices which are entered into "with the intent to injure or destroy a competitor" are prohibited. However, any form of competition tends to take trade away from other dealers with a natural injury to their businesses. The mere entry of an additional tradesman or professional man into a community where he secures a part of a limited amount of business is injurious to all competitors. Surely there cannot be anything unlawful about competition if no unfair practices are followed. Until the legislature sees fit to eliminate all competition between retail gasoline dealers, the mere fact that one dealer manages to take trade away from his rivals in business cannot be held to be a detrimental practice. Some impropriety in his means of accomplishing this result must be shown. What is the impropriety in giving a premium? It is not a form of gambling, nor a "lure to improvidence," and it will not lead to fraud. By giving a premium, defendant was merely offering the purchasing public more for its money. Surely there is nothing reprehensible in that. It is apparent that the giving of a premium has no evil effects which the legislature has sought to correct. It must be held that since the legislature permits competition between retail gasoline dealers, the giving of a premium is a legitimate trade practice.

There is no reasonable relationship between the prohibition of the giving of a premium and the protection of the public health, morals, safety and welfare.   Therefore, Act No. 282, § 6, Pub. Acts 1937, as applied to the retail sale of gasoline, is unconstitutional as a violation of article 2, § 16, of the Michigan Constitution.

The conviction is reversed, and defendant is ordered discharged.

WIEST, SHARPE, CHANDLER, and NORTH, JJ., concurred with BUTZEL, C. J.

McALLISTER, J. (*dissenting*).   Defendant was arrested for giving certain commodities to customers to promote the sale of petroleum products with intent to injure and destroy the business of a competitor, in violation of the provisions of Act No. 282, § 6, Pub. Acts 1937 (Comp. Laws Supp. 1937, § 9829-16, Stat. Ann. 1938 Cum. Supp. § 2878[6]). The case was tried before a court without a jury. The trial court found the defendant guilty.   On appeal defendant contends that the statute is unconstitutional, claiming that it violates Amendment 14, § 1, of the Federal Constitution, and article 2, § 16, of the Constitution of the State of Michigan (1908) in denying to him due process of law.   The facts are as stated by Chief Justice BUTZEL.

The questions before the court include the constitutionality of the statute in question and in turn require a consideration of the rule governing burden of proof, presumptions, the scope of the police power of the State, and whether there has been an arbitrary or capricious classification of persons subject to the act.

In passing on the constitutionality of statutes generally, it is a well settled rule that nothing but a clear

violation of the Constitution will authorize the courts to overrule the legislative will, and, where there is reasonable doubt as to the constitutionality of an act, it must be resolved in favor of the act.   *Albert* v. *Gibson,* 141 Mich. 698.

"When a litigant comes into court to ask the court to declare a particular statute null and void as being beyond the power of the legislature to pass, he must show precisely and conclusively that it is beyond such power."   *People, ex rel. Darling,* v. *Warden of City Prison,* 154 App. Div. 413, 424 (139 N. Y. Supp. 277).

A statute will be presumed to be constitutional by the courts unless the contrary clearly appears. *Scott* v. *Smart's Executors,* 1 Mich. 295; *Thompson* v. *Auditor General,* 261 Mich. 624.   In a case of doubt, every possible presumption not clearly inconsistent with the language and the subject matter is to be made in favor of the constitutionality of State legislation.   *Sears* v. *Cottrell,* 5 Mich. 251.   All reasonable presumptions or intendments must be indulged in favor of the validity of an act, and it is only when its invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution that a court will refuse to sustain its validity.   *Attorney General, ex rel. Barbour,* v. *Lindsay,* 178 Mich. 524.   A statute is presumed to be constitutional and it will not be declared unconstitutional unless clearly so, or so beyond a reasonable doubt.   *Bowerman* v. *Sheehan,* 242 Mich. 95 (61 A. L. R. 859).

Many cases have been cited by the people, as well as by the defendant and the *amici curiæ,* to point out the weight of authority in cases involving certain practices, as well as the expression of principles, governing the constitutional limitations herein in-

volved. Cases relating to particular instances of the application of the "due process" clause often illuminate the opinion prevalent at the time of such decisions as to what was deemed an invasion of liberty and property rights, or was harmful to the public interest and general welfare. What has been legitimate once may, however, in the course of the life, growth and development of society, come to be recognized as a new evil, and may, accordingly, be altogether prohibited or made subject to stringent police regulation. See *Holden* v. *Hardy,* 169 U. S. 366 (18 Sup. Ct. 383). Economic conditions which have supervened have required a reversal of previous decisions relating to the application of the "due process" clause to certain legislation. *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379 (57 Sup. Ct. 578, 108 A. L. R. 1330).

A living society does not stand still. It is ever moving, changing, expanding in economic and social relationships. The reaction of certain conduct may, at a given stage of development of society, be harmless, and at a different period, be fraught with peril to the public interest. Each case involving such conduct depends upon its facts and upon the nature and state of society at the time of impact.

"This may be illustrated. A lottery of itself is not wrong, may be fairer, having less of overreaching in it, than many of the commercial transactions that the Constitution protects. All participants in it have an equal chance; there is no admonishing caveat of one against the other. And at one time it was lawful. It came to be condemned by experience of its evil influence and effects. It is trite to say that practices harmless of themselves may, from circumstances, become the source of evil or may have evil tendency. *Murphy* v. *California,* 225 U. S. 623 (32 Sup. Ct. 697, 41 L. R. A. [N. S.] 153)." *Rast* v. *Van*

*Deman & Lewis Co.,* 240 U S. 342, 364 (36 Sup. Ct. 370, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455).

"As to what extent legislation should interfere in affairs political philosophers have disputed and always will dispute. It is not in our province to engage on either side, nor to pronounce anticipatory judgments. We must wait for the instance. Our present duty is to pass upon the statute before us, and if it has been enacted upon a belief of evils that is not arbitrary we cannot measure their extent against the estimate of the legislature. *McLean* v. *Arkansas,* 211 U. S. 539 (29 Sup. Ct. 206)." *Tanner* v. *Little,* 240 U. S. 369, 385 (36 Sup. Ct. 379).

In *Adams* v. *Tanner,* 244 U. S. 590, 600 (37 Sup. Ct. 662, L. R. A. 1917F, 1163, Ann. Cas. 1917D, 973), Mr. Justice Brandeis stated, in the course of a dissenting opinion, the rule which, undoubtedly, is not questioned:

"Whether a measure relating to the public welfare is arbitrary or unreasonable, whether it has no substantial relation to the end proposed is obviously not to be determined by assumptions or by *a priori* reasoning. The judgment should be based upon a consideration of relevant facts actual or possible—*ex facto jus oritur.* That ancient rule must prevail in order that we may have a system of living law."

The "due process" clause has been a reef upon which countless statutes of State and nation have been wrecked and destroyed. Decisions of courts have generally, however, departed from many of the early cases in which the personal opinions of judges on principles of economics and government appear to have been embodied in judicial determinations as axioms of law. From a crystalization of the ideas of Adam Smith and the *laissez faire* theory in opinions, what once seemed immutable in legal pronouncements has tor many years gradually under-

gone a change. And a larger judicial conception of
the police power of the State to regulate and restrain
activities of citizens in the public interest and for the
general welfare has come to embrace and sustain
statutory enactments which, a half century ago or
even in the past decade, would have been castigated
by courts as an attack on liberty, private property,
and free enterprise.

In *Hylton* v. *United States* (1796), 3 Dall. (3
U. S.) 171, Justice Patterson quoted copiously from
Adam Smith's "Wealth of Nations" to sustain his
opinion that a tax on carriages was not a direct tax.
Nearly a century later, in *Pollock* v. *Farmers Loan &
Trust Co.* (1895), 157 U. S. 429 (15 Sup. Ct. 673),
Chief Justice Fuller, in holding a Federal income
tax unconstitutional, sought light from the above
mentioned opinion and called attention to the fact
that Adam Smith's work had been published in 1776.
He further observed that Justice Patterson's opin-
ion had been fortified by the reading of extracts from
Adam Smith. Justice White, however, in a strong
dissenting opinion said that Washington and the
framers of the Constitution would not have adopted
and approved a carriage tax law, "if the word 'di-
rect,' as therein used, had the meaning which must
be attached to it, if read by the light of the theories
of * * * Adam Smith."

Justice Field, in the same case, later upon rear-
gument, joining in the majority of a five-to-four deci-
sion, in holding the statute providing for an income
tax unconstitutional (*Pollock* v. *Farmers Loan &
Trust Co.,* 158 U. S. 601 [15 Sup. Ct. 912]), concluded
the expression of his views with the following
ominous declaration (157 U. S. 607):

"Here I close my opinion. I could not say less in
view of questions of such gravity that go down to

the very foundation of the government. * * * The present assault upon capital is but the beginning. It will be but the stepping-stone to others, larger and more sweeping, till our political contests will become a war of the poor against the rich; a war constantly growing in intensity and bitterness.''

Such painful and melancholy predictions as to the effect of an income tax might conceivably have been softened if the prophetic vision of Justice Field could have pierced futurity and could have recognized that within a score of years the people of the United States would have disregarded his apprehension of calamity, and that an amendment providing for an income tax, after much bitter political contention and struggle, would have been written into the Constitution and generally accepted as a necessary and proper part of the powers of government; and it is a fair surmise that had not he entertained strong personal opinions in the field of economics, the decision of the court might have sustained the act of Congress; for Justice Field was ardent in his devotion to the ideas and principles of Adam Smith, as seen in the weaving of economic views into the fabric of constitutional law in his opinion in the case of *Butchers Union Slaughter-House & Livestock Landing Co.* v. *Crescent City Livestock Landing & Slaughter-House Co.* (1884), 111 U. S. 746, 757 (4 Sup. Ct. 652), wherein he said:

''It has been well said that 'the property which every man has in his own labor, as it is the original foundation of all other property, so it is the most sacred and inviolable. The patrimony of the poor man lies in the strength and dexterity of his own hands, and to hinder his employing this strength and dexterity in what manner he thinks proper, without injury to his neighbor, is a plain violation of this

most sacred property. It is a manifest encroachment upon the just liberty both of the workman and of those who might be disposed to employ him. As it hinders the one from working at what he thinks proper, so it hinders the others from employing whom they think proper.' Adam Smith's Wealth of Nations, bk. 1, chap. 10.''

Twenty years after the above opinion, Mr. Justice Holmes in *Otis* v. *Parker*, 187 U. S. 606 (23 Sup. Ct. 168), took occasion to point out the mistake of confusing economic views with constitutional prohibitions when he said:

''While the courts must exercise a judgment of their own, it by no means is true that every law is void which may seem to the judges who pass upon it excessive, unsuited to its ostensible end, or based upon conceptions of morality with which they disagree. Considerable latitude must be allowed for differences of view as well as for possible peculiar conditions which this court can know but imperfectly, if at all. Otherwise a constitution, instead of embodying only relatively fundamental rules of right, as generally understood by all English-speaking communities, would become the partisan of a particular set of ethical or economical opinions, which by no means are held *semper ubique et ab omnibus.*''

Later, in *Lochner* v. *New York* (1905), 198 U. S. 45, 75, 76 (25 Sup. Ct. 539, 3 Ann. Cas. 1133), Mr. Justice Holmes in the course of a dissenting opinion further emphasized, in a classic way, similar views:

''This case is decided upon an economic theory which a large part of the country does not entertain. If it were a question whether I agreed with that theory, I should desire to study it further and long before making up my mind. But I do not conceive that to be my duty, because I strongly believe that my agreement or disagreement has nothing to do

with the right of a majority to embody their opinions in law.  It is settled by various decisions of this court that State constitutions and State laws may regulate life in many ways which we as legislators might think as injudicious or if you like as tyrannical as this, and which equally with this interfere with the liberty to contract.  Sunday laws and usury laws are ancient examples.  A more modern one is the prohibition of lotteries.  The liberty of the citizen to do as he likes so long as he does not interfere with the liberty of others to do the same, which has been a shibboleth for some well-known writers, is interfered with by school laws, by the post office, by every State or municipal institution which takes his money for purposes thought desirable, whether he likes it or not.  The Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics. * * * Some of these laws embody convictions or prejudices which judges are likely to share.  Some may not.  But a Constitution is not intended to embody a particular economic theory, whether of paternalism and the organic relation of the citizen to the State or of *laissez faire.*  It is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar or novel and even shocking ought not to conclude our judgment upon the question whether statutes embodying them conflict with the Constitution of the United States.''

As an instance of the change in the current of judicial opinion with regard to the regulation or prohibition of a business deemed by a State legislature to be contrary to the public interest and general welfare, the United States supreme court in *Rast* v. *Van Deman & Lewis Co.* (1916), *supra,* held that a State statute imposing prohibitive taxes on merchants using profit-sharing coupons and trading stamps was not invalid under the ''due process'' clause of the Federal Constitution.  Mr. Justice

McKenna, in speaking for a unanimous court, admitted that the weight of authority was contrary to the decision of the court, but he stated that such weight of authority was opposed by cases *which marked a change of opinion as to the power of a legislature to prohibit such businesses for the general welfare,* in the following language, pp. 363, 368:

"In other words, does the statute interfere with the business liberty of complainants? Is it an illegal meddling with a lawful calling and a deprivation of freedom of contract? This is the contention, and it is attempted to be supported by the assertion that the schemes detailed in the bill are but a method of advertising and, as such mere allurements to customers, not detrimental in any way to the public health and morals, nor obstructive of the public welfare; but are a means of enterprise, mere incidents of the businesses of complainants and as beneficial to their customers as to them. And besides that they are but a method of giving discount, practically in some instances a rebate upon the price, and in others an equivalent gift of some article that may attract the choice of the purchaser, the choice being free and the article of definite utility and value.

"These contentions have the support of a number of cases. *They are opposed by others, not nearly so numerous as the supporting cases but marking a change of opinion.* Both sets of cases indicate by the statutes passed upon, a persistent legislative effort against the schemes under review or some form of them, beginning in 1880 and repeated from time to time until the statute in controversy was passed in 1913. In such differences between judicial and legislative opinion where should the choice be? That necessarily depends upon what reasoning judicial opinion was based. We appreciate the seriousness of the situation. Regarding the number of the cases only, they constitute a body of authority from

which there might well be hesitation to dissent except upon clear compulsion.

"The foundation of all of them is that the schemes detailed are based on an inviolable right, that they are but the exercise of a personal liberty secured by the Constitution of the United States and distinguished from other lawful exercise of business contracts and activity by a method of advertising and lawful inducements to an increased custom and that in them there is no element of chance or anything detrimental to the public welfare. But there may be partial or total dispute of the propositions. *And it can be urged that the reasoning upon which they are based regards the mere mechanism of the schemes alone and does not give enough force to their influence upon conduct and habit, not enough to their insidious potentialities.* As to all of which not courts but legislatures may be the best judges and, it may be, the conclusive judges. * * *

"Complainants allege that the license tax which the statute imposes is of prohibitory character and assert that they are exercising inviolable rights and privileges which the excess of the tax prevents in violation of the Fourteenth Amendment; they contend that hence the statute is invalid.

"It is not certain from the allegations of the bill that the tax is of the asserted character, but granting it to be so we have shown that the business schemes described in the bill are not protected from regulation or prohibition by the Constitution of the United States."

In *Tanner* v. *Little, supra,* 384, it was said of a similar trading stamp plan which had been discriminated against by a statute:

"It has other, and, it may be, deleterious, consequences. It does not terminate with the bringing together of seller and buyer, the profit of one and the desire of the other satisfied, the article bought

and its price being equivalents. It is not so limited in purpose or effect. It has ulterior purpose, and how it has developed complainants vividly represent by their averments. It appears that companies are formed, called trading stamp companies, which extend and facilitate the schemes, making a seller of merchandise their agent for the distribution of stamps to be redeemed by them or other merchants, the profit of all being secured through the retail purchaser who has been brought under the attraction of the system. There must, therefore, be something more in it than the giving of discounts, something more than the mere laudation of wares. If companies—evolved from the system, as counsel say in justification of them—are able to reap a profit from it, it may well be thought there is something in it which is masked from the common eye and that the purchaser at retail is made to believe that he can get more out of the fund than he has put into it, something of value which is not offset in the prices or quality of the articles which he buys. It is certain that the prices he pays make the efficiency of the system and the fund, if we may individualize it, out of which the cost of the instruments and agents of the system must be defrayed and the profit to all concerned paid. The system, therefore, has features different from the ordinary transactions of trade which have their impulse, as we have said, in immediate and definite desires having definite and measurable results. There may be in them at times reckless buying, but it is not provoked or systematized by the seller.

"Complainants charge that the tax of the statute is not upon the business but upon its incidents. The separation is artificial. It is the incidents which give character to the business, affecting it with evil, it was thought, provoking therefore against it the power of the State and taking away from it the immunity it else might have.

"It is unimportant what the incidents may be called, whether a method of advertising, discount giving or profit sharing. Their significance is not in their designations but in their influence upon the public welfare. And of this the judgment of the legislature must prevail, though it be controverted and opposed by arguments of strength. Nor is there support of the system or obstruction to the statute in declamation against sumptuary laws, nor in the assertion that there is evil lesson in the statute, nor in the prophecies which are ventured of more serious intermeddling with the conduct of business. Neither the declamation, the assertion nor the prophecies can influence a present judgment."

In the two cases above cited and in *Pitney* v. *Washington,* 240 U. S. 387 (36 Sup. Ct. 385), the United States Supreme Court held that the business of issuing trading stamps as premiums was subject to prohibition by a State legislature and that such business under the circumstances of the particular cases was not protected by the "due process" clause.

It is said that the right to engage in any business not harmful to the public is guaranteed by the Constitution. This is unquestioned; but the contrariety of decisions springs from the extent to which courts have accepted the legislative judgment as to what is injurious to the public interest.

The "trading-stamp cases" have well illustrated consideration of the principles before us. While, as said by Justice McKenna in 1916, the weight of authority of cases decided theretofore held that statutes discriminating against businesses engaging in such practices were unconstitutional, a change of opinion was apparent in later cases. The reasons upon which legislative judgment in such cases was sustained were suggested in several cases and are pertinent to the instant case.

In *State* v. *Pitney*, 79 Wash. 608 (140 Pac. 918, Ann. Cas. 1916A, 209), in which the State court was sustained by *Pitney* v. *Washington, supra*, it was said:

"If a state of facts could exist which would justify the legislature in forbidding the use of trading stamps, it must be presumed to have actually existed. What state of facts might reasonably have prompted the legislature to forbid the use of trading stamps in connection with the sale of merchandise? It might reasonably be supposed or presumed that the legislature believed that the use of these stamps would encourage indiscriminate and unnecessary purchasing by people ill able to indulge in any extravagance. Or suppose that the legislature believed that the use of these stamps was practically forced upon certain merchants without any practical benefit resulting therefrom, and thus they were compelled to pay 3½ per cent. upon their gross sales for the use of the stamps. The legislature might reasonably have believed that the stamp companies, in order to cause the stamps to be used in a certain city, would contract with one merchant for their use, agreeing to pay him a percentage of the sums collected by them from other merchants, and then use the first contract so secured to force other merchants into using the stamps, or suffer loss of trade by failure so to do. In other words, that legitimate business was virtually coerced into paying tribute to the stamp company, a nonproducer of wealth or value."

In *District of Columbia* v. *Kraft*, 35 App. D. C. 253, 268 (30 L. R. A. [N. S.] 957), after an elaborate review of the authorities, the court said:

"The whole country is now agitated by the increased cost of living that has grown to alarming proportions, and legislative bodies are inquiring into its causes with a view, if possible, of providing reme-

dies for the mischief. While there is difference of opinion as regards the chief source, all concur in the opinion that every introduction of superfluous middlemen, and consequent unnecessary charges between producer and consumer, undoubtedly contribute to swell the stream to overflowing. * * *

"Now, what are the conditions presented by the facts in this case? An entirely unnecessary middleman, for his own profit solely, has injected himself between the regular merchant on the one hand, and his customers on the other. He receives $3.50 for every thousand stamps issued to the customers, and redeems such as may be presented, in goods or in cash at $2 per thousand. By this means the corporation represented by the defendant in error has in the first year of its intervention received about $12,000, which should have either been retained by the merchant or received by his customers.

"Several other concerns being engaged in the same business, their profits are probably as great, if not greater. We have then this large sum of money annually taken from the merchant and his customers, and added to the gross cost of living of all of the people of the District, without return. Is it not for the public welfare, in the juridical sense of the term, to prohibit such an undertaking? We think that it is. Must this public welfare be sacrificed to the unlimited freedom of contract invoked in this case, to protect the right to prey upon local commerce? We think not."

In *State* v. *Wilson*, 101 Kan. 789, 802 (168 Pac. 679, L. R. A. 1918B, 374), it was said:

"It is readily conceivable that a company making a business of furnishing and redeeming trading stamps may have refused to deal with more than one merchant (or one merchant handling a particular line of goods) in each community, thereby establishing a monopoly in the marketing of its wares, and

effecting an alliance analogous to an ordinary combination in restraint of trade, to which all with whom it deals are parties, and from which they derive an undue preferential advantage over their competitors. It is not necessary to the validity of the statute that it should be shown that this condition actually existed; it is enough that such may have been the case, and that the business forbidden or repressed is adapted to bringing about that result. To justify the legislation on this theory it is not necessary that the business sought to be restrained should have amounted to such a monopoly or combination in restraint of trade as to have been unlawful in the absence of a statute. It is competent for the legislature to extend the scope of the common-law principles and make them applicable to new situations. The trading stamp device, where redemption is made otherwise than through the dealer using them, necessarily introduces a middleman into the transaction between the dealer and his customer,—a third party who makes a profit out of their bargaining. Such a middleman—a company engaged solely in the business of issuing and redeeming stamps—is in a position to exert an unfavorable influence upon local conditions. It may by the method suggested create a monopoly,—a combination in restraint of trade; it may by playing one concern against another force its system upon a community."

With regard to the extent of the so-called police power, it was said in *Chicago, Burlington & Quincy R. Co.* v. *People of the State of Illinois, ex rel. Drainage Commissioners,* 200 U. S. 561, 592 (26 Sup. Ct. 341, 4 Ann. Cas. 1175):

"We hold that the police power of a State embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals or the public safety. *Lake Shore*

*& M. S. R. Co.* v. *Ohio,* 173 U. S. 285, 292 (19 Sup. Ct. 465); *Gilman* v. *Philadelphia,* 3 Wall. (70 U. S.) 713, 729; *Pound* v. *Turck,* 95 U. S. 459, 464; *Hannibal & St. J. Railroad Co.* v. *Husen,* 95 U. S. 465, 470. And the validity of a police regulation, whether established directly by the State or by some public body acting under its sanction, must depend upon the circumstances of each case and the character of the regulation, whether arbitrary or reasonable and whether really designed to accomplish a legitimate public purpose.''

In *Barbier* v. *Connolly,* 113 U. S. 27 (5 Sup. Ct. 357), with regard to the Fourteenth Amendment, it was said:

''Neither the amendment—broad and comprehensive as it is—nor any other amendment, was designed to interfere with the power of the State, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the State, develop its resources, and add to its wealth and prosperity. From the very necessities of society, legislation of a special character, having these objects in view, must often be had in certain districts. * * * Though, in many respects, necessarily special in their character, they do not furnish just ground of complaint if they operate alike upon all persons and property under the same circumstances and conditions. Class legislation, discriminating against some and favoring others, is prohibited, but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment.''

In *Nebbia* v. *New York,* 291 U. S. 502, 525 (54 Sup. Ct. 505, 89 A. L. R. 1469), Mr. Justice Roberts, speaking for the court, discussed the extent of regulation

and prohibition of business, which was deemed by the legislature to be inimical to the public interest, in the following language:

"The Fifth Amendment, in the field of Federal activity, and the Fourteenth, as respects State action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. It results that a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under other circumstances, because the reasonableness of each regulation depends upon the relevant facts.

"The reports of our decisions abound with cases in which the citizen, individual or corporate, had vainly invoked the Fourteenth Amendment in resistance to necessary and appropriate exertion of the police power.

"The court has repeatedly sustained curtailment of enjoyment of private property, in the public interest. The owner's rights may be subordinated to the needs of other private owners whose pursuits are vital to the paramount interests of the community. * * *

"The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. Certain kinds of business may be prohibited; and the right to conduct a business, or to pursue a calling, may be conditioned. Regulation of a business to prevent waste of the State's resources may be justified. And statutes prescribing the terms upon which those conducting certain businesses may contract, or imposing terms

if they do enter into agreements, are within the State's competency.

"Legislation concerning sales of goods, and incidentally affecting prices, has repeatedly been held valid. In this class fall laws forbidding unfair competition by the charging of lower prices in one locality than those exacted in another, by giving trade inducements to purchasers, and by other forms of price discrimination. * * *

"It is clear that there is no closed class or category of businesses affected with a public interest, and the function of courts in the application of the Fifth and Fourteenth Amendments is to determine in each case whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory. * * * The phrase 'affected with a public interest' can, in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good. In several of the decisions of this court wherein the expressions 'affected with a public interest,' and 'clothed with a public use,' have been brought forward as the criteria of the validity of price control, it has been admitted that they are not susceptible of definition and form an unsatisfactory test of the constitutionality of legislation directed at business practices or prices. These decisions must rest, finally, upon the basis that the requirements of due process were not met because the laws were found arbitrary in their operation and effect. But there can be no doubt that upon proper occasion and by appropriate measures the State may regulate a business in any of its aspects, including the prices to be charged for products or commodities it sells.

"So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a State is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legis-

lation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio.* 'Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine.' *Northern Securities Co.* v. *United States,* 193 U. S. 197, 337, 338 (24 Sup. Ct. 436). And it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power.

"The law-making bodies have in the past endeavored to promote free competition by laws aimed at trusts and monopolies. The consequent interference with private property and freedom of contract has not availed with the courts to set these enactments aside as denying due process. Where the public interest was deemed to require the fixing of minimum prices, that expedient has been sustained. If the law-making body within its sphere of government concludes that the conditions or practices in

an industry make unrestricted competition an inadequate safeguard of the consumer's interest, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the legislature to be fair to those engaged in the industry and to the consuming public. And this is especially so where, as here, the economic maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other. The Constitution does not secure to anyone liberty to conduct his business in such fashion as to inflict injury upon the public at large, *or upon any substantial group of the people.* Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty.''

The opinion and decision in the *Nebbia Case,* in the extensive gathering together and collation of specific instances where courts have sustained statutes prohibiting, or subjecting businesses to rigorous regulation, and in the clear and unequivocal statement of legal principles relating to the necessity of courts to accept legislative judgment in matters affecting the public interest, are of transcendent importance in the case before us. It is, perhaps, significant that counsel for defendant seeks to avoid the implications of the *Nebbia Case,* in urging that it concerned only the facts in that case—and should be limited to considerations of State control of the distribution of milk in an emergency where it directly affects the health of densely populated areas.

To substantiate such argument, defendant cites *Morehead* v. *New York, ex rel. Tipaldo,* 298 U. S. 587 (56 Sup. Ct. 918, 103 A. L. R. 1445), where it was sought by a minority of the court to apply the principles of the *Nebbia Case* and overrule *Adkins* v. *Children's Hospital of the District of Columbia,* 261 U. S. 525 (43 Sup. Ct. 394, 24 A. L. R. 1238). The *Tipaldo Case,* however, by a five-to-four majority held unconstitutional a State statute providing for minimum wages for women in industry. It is true that Chief Justice Hughes, in his dissenting opinion, cited the *Nebbia Case* and Mr. Justice Stone in an accompanying dissenting opinion said:

"We should follow our decision in the *Nebbia Case* and leave the selection and the method of the solution of the problems to which the statute is addressed where it seems to me the Constitution has left them, to the legislative branch of the government."

But while the *Nebbia Case* was not followed in that decision, only one year after the *Tipaldo Case,* in *West Coast Hotel Co.* v. *Parrish, supra,* the supreme court held that a statute providing for minimum wages for women in industry was constitutional in a five-to-four opinion and expressly overruled *Adkins* v. *Children's Hospital of the District of Columbia, supra,* at the same time distinguishing the *Tipaldo Case* on grounds of appellate procedure.

In speaking for the majority of the court, in *West Coast Hotel Co.* v. *Parrish, supra,* Chief Justice Hughes cited and quoted from the *Nebbia Case* as embodying the rule to be applied, and further said (p. 389):

"The supreme court of Washington has upheld the minimum wage statute of that State. It has

decided that the statute is a reasonable exercise of the police power of the State. In reaching that conclusion the State court has invoked principles long established by this court in the application of the Fourteenth Amendment. The State court has refused to regard the decision in the *Adkins Case* as determinative and has pointed to our decisions both before and since that case as justifying its position. We are of the opinion that this ruling of the State court demands on our part a reexamination of the *Adkins Case.* The importance of the question, in which many States having similar laws are concerned, the close division by which the decision in the *Adkins Case* was reached, and the economic conditions which have supervened, and in the light of which the reasonableness of the exercise of the protective power of the State must be considered, make it not only appropriate, but we think imperative, that in deciding the present case the subject should receive fresh consideration.''

It is of interest to note that in prefacing a statement of reasons for overruling the previous case, the Chief Justice said (p. 399):

''There is an additional and compelling consideration which *recent economic experience has brought into a strong light.''*

It is obvious that the statement of principles of law in the *Nebbia Case* is not limited in its scope to the mere facts which were before the court for decision in that case.

With regard to the constitutionality of statutes prohibiting price cutting by retail merchants, the United States supreme court had held that legislative judgment, if debatable, as to the injurious effect of such practices, not only upon the producer of such goods, but upon the general public, must be accepted.

In *Old Dearborn Distributing Co.* v. *Seagram Distillers Corp.*, 299 U. S. 183, 195 (57 Sup. Ct. 139, 106 A. L. R. 1476), it was said:

"There is a great body of fact and opinion tending to show that price cutting by retail dealers is not only injurious to the good will and business of the producer and distributor of identified goods, but injurious to the general public as well. The evidence to that effect is voluminous; but it would serve no useful purpose to review the evidence or to enlarge further upon the subject. True, there is evidence, opinion and argument to the contrary; but it does not concern us to determine where the weight lies. We need say no more than that the question may be regarded as fairly open to differences of opinion. The legislation here in question proceeds upon the former and not the latter view; and the legislative determination in that respect, in the circumstances here disclosed, is conclusive so far as this court is concerned. Where the question of what the facts establish is a fairly-debatable one, we accept and carry into effect the opinion of the legislature. *Radice* v. *New York*, 264 U. S. 292, 294 (44 Sup. Ct. 325); *Zahn* v. *Board of Public Works*, 274 U. S. 325, 328 (47 Sup. Ct. 594), and cases cited."

In the accompanying opinion in this case, it is said that "any form of competition tends to take trade away from other dealers with a natural injury to their businesses. The mere entry of an additional tradesman or professional man into a community where he secures a part of a limited amount of business is injurious to all competitors."

In connection therewith, it may be pertinent to refer to the opinion of Mr. Justice Holmes in *Central Lumber Co.* v. *South Dakota*, 226 U. S. 157 (33 Sup. Ct. 66), where it is said:

"The plaintiff in error was found guilty of unfair discrimination under session laws of South Dakota

for 1907, chap. 131. * * * By the statute anyone 'engaged in the production, manufacture or distribution of any commodity in general use, that intentionally, for the purpose of destroying the competition of any regular, established dealer in such commodity, * * * shall discriminate between different sections, * * * of this State, by selling such commodity at a lower rate in one section * * * than such person * * * charges for such commodity in another section, * * * after equalizing the distance from the point of production,' * * * shall be guilty of the crime and liable to the fine. * * *

"It is said that an indefensible classification may be disguised in the form of a description of the acts constituting the offense, and it is urged that to punish selling goods in one place lower than at another in effect is to select the class of dealers that have two places of business for a special liability, and in real fact is a blow aimed at those who have several lumber yards along a line of railroad, in the interest of independent dealers. *All competition, it is added, imports an attempt to destroy or prevent the competition of rivals, and there is no difference in principle between the prohibited act and the ordinary efforts of traders at a single place. The premises may be conceded without accepting the conclusion that this is an unconstitutional discrimination.* If the legislature shares the now prevailing belief as to what is public policy and finds that a particular instrument of trade war is being used against that policy in certain cases, it may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses, and it may do so none the less that the forbidden act does not differ in kind from those that are allowed.''

It is of no great importance that the United States supreme court has held that the business of selling gasoline was not affected with a public interest so as to permit statutory regulation of retail prices,

*Williams* v. *Standard Oil Company of Louisiana,*
278 U. S. 235 (49 Sup. Ct. 115, 60 A. L. R. 596), as
suggested by appellant.

In *Tyson* v. *Banton,* 273 U. S. 418, 445 (47 Sup.
Ct. 426, 58 A. L. R. 1236), in the course of an illumi-
nating dissenting opinion, Mr. Justice Holmes con-
sidered the phrase ''affected with a public interest''
and concluded that it could be dispensed with, in the
following language:

''We fear to grant power and are unwilling to
recognize it when it exists. The States very gen-
erally have stripped jury trials of one of their most
important characteristics by forbidding judges to
advise the jury upon the facts  *  *  *  and when
legislatures are held to be authorized to do anything
considerably affecting public welfare it is covered
by apologetic phrases like the police power, or the
statement that the business concerned has been dedi-
cated to a public use. The former expression is
convenient, to be sure, to conciliate the mind to some-
thing that needs explanation: the fact that the con-
stitutional requirement of compensation when prop-
erty is taken cannot be pressed to its grammatical
extreme; that property rights may be taken for pub-
lic purposes without pay if you do not take too much;
that some play must be allowed to the joints if the
machine is to work. But police power often is used in
a wide sense to cover and, as I said, to apologize for
the general power of the legislature to make a part
of the community uncomfortable by a change.

''I do not believe in such apologies. I think the
proper course is to recognize that a State legislature
can do whatever it sees fit to do unless it is re-
strained by some express prohibition in the Consti-
tution of the United States or of the State, and that
courts should be careful not to extend such prohibi-
tions beyond their obvious meaning by reading into
them conceptions of public policy that the particular
court may happen to entertain. Coming down to

the case before us I think, as I intimated in *Adkins*
v. *Children's Hospital of the District of Columbia,*
261 U. S. 525, 569 (43 Sup. Ct. 394, 24 A. L. R. 1238),
that the notion that a business is clothed with a pub-
lic interest and has been devoted to the public use
is little more than a fiction intended to beautify what
is disagreeable to the sufferers. The truth seems
to me to be that, subject to compensation when com-
pensation is due, the legislature may forbid or re-
strict any business when it has a sufficient force of
public opinion behind it."

In *Holden* v. *Hardy, supra,* 392, it was said:

"Rights of property, like all other social and con-
ventional rights, are subject to * * * such reason-
able restraints and regulations established by law
as the legislature, under the governing and control-
ling power vested in them by the Constitution, may
think necessary and expedient. * * *

"While this power is necessarily inherent in every
form of government, it was, prior to the adoption of
the Constitution, but sparingly used in this country.
As we were then almost purely an agricultural peo-
ple, the occasion for any special protection of a par-
ticular class did not exist. Certain profitable em-
ployments * * * which were then considered to be
legitimate have since fallen under the ban of public
opinion, and are now either altogether prohibited, or
made subject to stringent police regulations."

It cannot be held that the statute before us is arbi-
trary, capricious or unreasonable in the classifica-
tion of persons subject to its provisions. In *German
Alliance Ins. Co.* v. *Lewis,* 233 U. S. 389, 418 (34 Sup.
Ct. 612, L. R. A. 1915 C, 1189), it is said:

"A citation of cases is not necessary, nor·for the
general principle that a discrimination is valid if not
arbitrary, and arbitrary in the legislative sense, that
is, outside of that wide discretion which a legislature
may exercise. A legislative classification may rest

on narrow distinctions. *Legislation is addressed to evils as they may appear, and even degrees of evil may determine its exercise.*"

If any state of facts reasonably can be conceived that would sustain statutory classification, its existence must be assumed. *Naudzius* v. *Lahr*, 253 Mich. 216 (74 A. L. R. 1189, 30 N. C. C. A. 179).

In *Borden's Farm Products Co., Inc.*, v. *Baldwin*, 293 U. S. 195, 209 (55 Sup. Ct. 187), it is said:

"When the classification made by the legislature is called in question, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of the existence of that state of facts, and one who assails the classification must carry the burden of showing by a resort to common knowledge or other matters which may be judicially noticed, or to other legitimate proof, that the action is arbitrary. *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61 (31 Sup. Ct. 337, Ann. Cas. 1912 C, 160) ; *Ohio, ex rel. Clarke*, v. *Deckebach*, 274 U. S. 392, 397 (47 Sup. Ct. 630) ; *Lawrence* v. *State Tax Com'n of Mississippi*, 286 U. S. 276, 283 (52 Sup. Ct. 556, 87 A. L. R. 374)."

"It is established that a distinction in legislation is not arbitrary, if any state of facts reasonably can be conceived that would sustain it, and the existence of that state of facts at the time the law was enacted must be assumed. * * * It makes no difference that the facts may be disputed or their effect opposed by argument and opinion of serious strength. It is not within the competency of the courts to arbitrate in such contrariety." *Rast* v. *Van Deman & Lewis Co.*, *supra*, 357.

The burden of proof is upon the defendant to show that the statutory discrimination is arbitrary and in the absence of some factual foundation the presumption of constitutionality must prevail.

In *Metropolitan Casualty Ins. Co.* v. *Brownell*, 294 U. S. 580, 584 (55 Sup. Ct. 538), it was said:

"It is a salutary principle of judicial decision, long emphasized and followed by this Court, that the burden of establishing the unconstitutionality of a statute rests on him who assails it, and that courts may not declare a legislative discrimination invalid unless, viewed in the light of facts made known or generally assumed, it is of such a character as to preclude the assumption that the classification rests upon some rational basis within the knowledge and experience of the legislators. A statutory discrimination will not be set aside as the denial of equal protection of the laws if any state of facts reasonably may be conceived to justify it. *Rast* v. *Van Deman & Lewis Co.*, 240 U. S. 342, 357 (36 Sup. Ct. 370, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455); *State Board of Tax Commissioners of Indiana* v. *Jackson*, 283 U. S. 527, 537 (51 Sup. Ct. 540, 73 A. L. R. 1464, 75 A. L. R. 1536)."

In *O'Gorman & Young, Inc.*, v. *Hartford Fire Ins. Co.*, 282 U. S. 251, 257 (51 Sup. Ct. 130, 72 A. L. R. 1163), it was said:

"The statute here questioned deals with a subject clearly within the scope of the police power. We are asked to declare it void on the ground that the specific method of regulation prescribed is unreasonable and hence deprives the plaintiff of due process of law. As underlying questions of fact may condition the constitutionality of legislation of this character, *the presumption of constitutionality must prevail in the absence of some factual foundation of record for overthrowing the statute.* It does not appear upon the face of the statute, or from any facts of which the court must take judicial notice, that in New Jersey evils did not exist in the business of fire insurance for which this statutory provision was an appropriate remedy."

In order to hold the statute unconstitutional on the basis of arbitrary and unreasonable classification, we must say that no state of facts can reasonably be conceived that would justify the legislature in providing therefor. *Naudzius* v. *Lahr, supra.* But there is nothing before us that would show such arbitrary and unreasonable conduct. We can conceive that in the bakery business and the sale of petroleum products these practices were especially pronounced, and that in such occupations, price cutting and price wars were more energetically carried on than in other lines of business to the disadvantage of the public. In *Schmidinger* v. *Chicago,* 226 U. S. 578 (33 Sup. Ct. 182, Ann. Cas. 1914 B, 284), it was held that the right of legislature to regulate one trade and not another is well settled as not denying due process of law; that the making and selling of bread, particularly in large cities, is obviously a trade subject to police regulation; that laws prescribing standard size of loaves of bread and prohibiting the sale of other sizes has been sustained by the courts, and that the legislative authorities, and not the courts, are primarily the judges of the necessities of local situation calling for such regulations.

In the instant case, we do not know, of course, that such were the facts; but the burden is upon the defendant to show that such classification is unreasonable, and in the absence of any such showing, we must assume that the legislature acted reasonably, for the statute is presumed to be constitutional. The statute in this case is not on its face in violation of constitutional safeguards.

With regard to the specific intent of defendant which, it is urged, is, according to the statute, required to be proved, a guilty intention may be inferred from an act, and this is an inference of fact to be drawn from the evidence, and not an implica-

tion of law. 14 Am. Jur. p. 783. In *Ellis* v. *United States,* 206 U. S. 246 (27 Sup. Ct. 600, 11 Ann. Cas. 589), where a statute under consideration by the court provided that a person should be deemed guilty of a misdemeanor, who should "intentionally violate any provision" of the act, defendant urged that there was no proof of his unlawful intention. In answer to such contention, Mr. Justice Holmes, speaking for the court, said:

"The jury were instructed, subject to exception, that if the defendant intended to permit the men to work over eight hours on the calendar day named he intended to violate the statute. The argument against the instruction is that the word 'intentionally' in the statute requires knowledge of the law, or at least that to be convicted Ellis must not have supposed, even mistakenly, that there was an emergency extraordinary enough to justify his conduct. The latter proposition is only the former a little disguised. Both are without foundation. *If a man intentionally adopts certain conduct in certain circumstances known to him, and that conduct is forbidden by the law under those circumstances, he intentionally breaks the law in the only sense in which the law ever considers intent.* The judgment in this case must be affirmed."

In the instant case, defendant knew of the provisions of the law. He gave away commodities in connection with the sale of his product. If such conduct resulted in injury to his competitors, which was sought to be prevented by the statute, his intention to injure was a question of fact for the court, who heard the case without a jury, and the court could properly find from inferences to be drawn from the evidence that the required intent was present on the part of defendant at the time of the commission of the acts complained of.

It is true that, as stated, although the Federal supreme court is the final judge of violation of the Federal Constitution, the decision of the Supreme Court of this State is final on the question of whether or not a State statute conflicts with the State Constitution. However, where, as here, the validity of a statute depends upon the provision of our State Constitution which is practically identical to a similar provision of the Federal Constitution, the decisions of the United States supreme court in cases governing the application thereof are strongly persuasive as authority. Moreover, it is claimed by defendant that the statute in question is in violation of the "due process" clause of the Federal Constitution. Shall we, then, hold, following the decisions of the Federal supreme court, that by the statute before us, the State would not deprive defendant of "liberty or property, without due process of law" (U. S. Const. am. 14, § 1), in violation of these provisions of the Federal Constitution; but that, by the same statute, the State would deprive defendant of "liberty or property without due process of law" (Mich. Const. [1908], art. 2, § 16), in violation of these identical provisions of our State Constitution? Such conclusions would appear to be unseemly. It is not necessary that we overrule any cases adjudicated by this court in order to acquiesce in the decisions of the United States supreme court in the application of the "due process" clause.

But in *State* v. *J. M. Seney Co.* (1919), 134 Md. 437 (107 Atl. 189), the supreme court of Maryland after previously holding that statutory restrictions on the trading stamp business, amounting to a practical prohibition, were unconstitutional, reversed such previous decisions, and after holding that the Federal supreme court decisions were conclusive, so far as the question of infringement of the Federal

Constitution was concerned, stated that, in view of the considerations which the Federal supreme court had suggested in support of legislative authority to apply the police power to the trading stamp business, it could not justly hold that action to this end by the State legislature was altogether unreasonable and nugatory; and that upon the principles of the Federal cases it would hold the act to be excluded from the operation of the no more restrictive limitations, of the State Constitution. This view was taken notwithstanding the court's earlier decision in *State* v. *Caspare* (1911), 115 Md. 7 (80 Atl. 606), that such prohibitory legislation was unconstitutional, which ruling the court said was then in accord with the great weight of authority and with the view then prevailing as to the extent and limitations of the police power.

The effect of the United States supreme court decisions involving the validity of trading stamp legislation upon the State courts was considered, also, in *Sperry & Hutchinson Co.* v. *State* (1919), 188 Ind. 173, 180 (122 N. E. 584), in which it was said:

"It is the province of the State courts to interpret and apply the provisions of their State Constitutions, but where a provision of a State Constitution is similar in meaning and application to a provision of the Federal Constitution, it is desirable that there should be no conflict between the decisions of the State courts and the Federal courts on the subject involved. While a decision of the Supreme Court sustaining the validity of a State statute as not violative of any provision of the 14th Amendment is not absolutely binding on the courts of the State when the statute is attacked as being in conflict with a provision of the State Constitution having the same effect, still, the Federal decision in such

cases is strongly persuasive as authority, and is generally acquiesced in by the State courts.''

In the instant case it would appear reasonable and proper that this court follow the decisions of our Federal supreme court on the question of ''due process'' herein involved.

Are we, rather, under the proofs in this case, to hold that no state of facts is reasonably conceivable to sustain the legislative judgment of prohibiting gifts and premiums in the sale of commodities as an unfair method of competition and a destructive trade practice?

To do so, we must consider that the legislatures of most of the States of the Union have, with monotonous repetition during the past 60 years, been unreasonable and capricious in continuously enacting and reenacting similar laws. Of course, it is within our power to do this. But, ''The adoption of similar requirements by many States evidences a deep-seated conviction both as to the presence of the evil, and as to the means adapted to check it. *Legislative response to that conviction cannot be regarded as arbitrary or capricious and that is all we have to decide.*'' Chief Justice Hughes, in *West Coast Hotel Co.* v. *Parrish, supra,* 399.

It is asked: ''What is the impropriety of giving a premium?'' But the burden is not upon the State to prove any impropriety. ''And it is not required that we should be sure of the precise reasons for such judgment, or that we should certainly know them, or be convinced of the wisdom of the legislation. *Southwestern Oil Co.* v. *Texas,* 217 U. S. 114, 126, 127 (30 Sup. Ct. 496).'' *Rast* v. *Van Deman & Lewis Co., supra,* 365. And it can be urged that the reasoning of defendant's argument contending that the statute is unconstitutional ''regards the mere mechanism of the schemes alone and does not give

enough force to their influence upon conduct and habit, not enough to their insidious potentialities." *Rast* v. *Van Deman & Lewis Co., supra,* 364.

It is said in the accompanying opinion that:

"However, a price war does tend to have undesirable results, and assuming, but not deciding, that a tendency toward a price war might be a basis of valid regulation of retail gasoline sales by the legislature, it does not follow that enforcement of section 6 of the statute will have the effect of preventing such price wars."

But in order to hold the statute constitutional it is not necessary to find, nor does it need to follow, that the enforcement of the statute will have the effect of preventing such price wars. The law is not void because it may appear to the court as excessive, or unsuited to its ostensible end. *Otis* v. *Parker, supra.*

Referring to the further observation: "It is claimed that a price war may result in violence and lawlessness with injury to person and property. This may be prevented by proper performance of the duties on the part of the police and prosecutor." But, is not the method to be used in dealing with such an economic calamity a question for the legislature? And may it not also be a valid legislative judgment that the means of avoiding such dangers to the public and to the business interests involved shall be a statute outlawing practices that give rise to such results?

To hold that this statute is unconstitutional, we must say that the legislation can have no conceivable relation to the avoidance of injury to the public at large, *Schmidinger* v. *Chicago, supra;* or to public convenience or general prosperity, *Bacon* v. *Walker,* 204 U. S. 311, 317 (27 Sup. Ct. 289); or to that of any substantial group of the people, *Nebbia* v. *New*

*York, supra;* or to their welfare or prosperity, *Barbier* v. *Connolly, supra;* or to the public peace, comfort, or convenience, *Lake Shore & M. S. R. Co.* v. *Ohio*, 173 U. S. 285 (19 Sup. Ct. 465). We must further hold, in such an event, that the strong presumption of constitutionality has been overcome, although no proof has been offered as to the unreasonableness of the statute and such burden of proof is upon the defendant; that, although we have no information or factual background (which it is the part of defendant to furnish, *O'Gorman & Young, Inc.*, v. *Hartford Fire Ins. Co., supra,*) with regard to such trade practices, it is clearly obvious to us, beyond any reasonable doubt, under any conceivable set of facts, that it is impossible for such a statute to have a reasonable relation to the peace, health, good order, welfare or prosperity of the public or a substantial group of the people.

Various states of facts, it would appear, can be reasonably conceived that could justify the legislature in enacting this statute; many have been outlined in the cases. The legislature may have had in mind that the ordinary gasoline distributor usually is not a dealer in china and glassware and other merchandise distributed in a well-organized, mathematically-planned premium system and that premium companies organized on a large scale are necessary adjuncts; that legitimate business is virtually coerced into paying tribute to such organizations in order to compete; that the exclusive advantage given by contract between such a premium organization and a dealer selected in a certain district unfairly deprived other legitimate dealers of their customers; that the introduction of such middlemen increases the costs to the buyer and seller of petroleum products and that they were both to be protected by such legislation; that such a practice thrust an additional

and unnecessary cost on distribution which must ultimately be borne by the public and, under a competitive system, it cannot be successfully resisted by individuals; that if such dealers did not enter into the plan of a premium company or into the business of giving premiums, price cutting would necessarily follow on the part of those not partaking in such a plan; and that in a market where consumption does not substantially vary with prices, a price war would have evil effects upon the public and the individual sellers with a possible extermination of those who were not able to survive such price war and a resultant tendency to eliminate competition. The legislature could have believed that it was contrary to the public interest that citizens should be deceived by trade methods and stratagems into a mistaken belief that they received something for nothing; that the public was entitled to know the real price of the commodities it paid for and that, in view of the foregoing, it was determined that such businesses were parasitical and should be eliminated, needless middlemen adding their profits to the costs of necessities removed from the stream of trade, and dangers of price wars averted by the enactment of such a statute. See *State* v. *Langley* (1938), 53 Wyo. 332 (84 Pac. [2d] 767). Whether such legislative judgment would be disputable or unwise or injudicious, I cannot agree that in such a case it would be unreasonable, arbitrary, and capricious without any conceivable relation to the public interest.

Can we say then that we are convinced beyond a reasonable doubt by evidence overcoming the presumption of constitutionality that no state of facts can sustain the legislative judgment that it is in the public interest to prohibit such practices? I think not.

Regarding the view and judgment of legislative bodies in reference to statutes designed to meet new economic problems, in the light of the "due process" clause, Mr. Justice Brandeis, speaking in *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 309 (52 Sup. Ct. 371) in the course of a dissenting opinion, in words that are memorable, said:

"Whether that view is sound nobody knows. The objections to the proposal are obvious and grave. The remedy might bring evils worse than the present disease. The obstacles to success seem insuperable. The economic and social sciences are largely uncharted seas. * * *

"There must be power in the States * * * to remould, through experimentation, our economic practices and institutions to meet changing social and economic needs. * * *

"To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the nation. * * * This court has the power to prevent an experiment. We may strike down the statute which embodies it on the ground that, in our opinion, the measure is arbitrary, capricious or unreasonable. We have power to do this, because the due process clause has been held by the court applicable to matters of substantive law as well as to matters of procedure. But in the exercise of this high power, we must be ever on our guard, lest we erect our prejudices into legal principles. If we would guide by the light of reason, we must let our minds be bold."

The statute in question is constitutional. There was no error on the trial. The judgment should be affirmed.

POTTER, J., concurred with MCALLISTER, J. BUSH-NELL, J., did not sit.