*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* CONTEMPT OF PAVLOS-HACKNEY.

---

DEPARTMENT OF AGRICULTURE AND
RURAL DEVELOPMENT,

        Plaintiff-Appellee,

v

ZANTE, INC, d/b/a MARLENA'S BISTRO AND
PIZZERIA,

        Defendant-Appellant,

and

MARLENA PAVLOS-HACKNEY,

        Appellant.

FOR PUBLICATION
October 20, 2022
9:10 a.m.

No. 357407
Ingham Circuit Court
LC No. 21-000113-CZ

---

Before: SWARTZLE, P.J., and RONAYNE KRAUSE and GARRETT, JJ.

RONAYNE KRAUSE, J.

      The contemnors, Marlena Pavlos-Hackney (Ms. Pavlos-Hackney) and her business, Zante, Inc., d/b/a/ Marlena's Bistro and Pizzeria (Marlena's), appeal by right following two judgments of contempt entered against them by the trial court. The contempts were for Ms. Pavlos-Hackney's continued operation of Marlena's in willful defiance of the trial court's orders to cease operation. In turn, the orders to cease operation arose out of plaintiff, the Michigan Department of Agriculture and Rural Development (MDARD), suspending the food establishment license for Marlena's, following Ms. Pavlos-Hackney's willful defiance of public health and safety orders related to the COVID-19 pandemic. We affirm the contempts, but we remand for the trial court to refashion the second of the two contempt fines.

-1-

# I. MATTERS AT ISSUE

Although the contemnors argue that the orders to cease operation were improper for various reasons, they have never seriously disputed that they violated those orders—and given the publicity surrounding Ms. Pavlos-Hackney's vows to continue operating her restaurant despite those orders, no such dispute would be plausible. The propriety of the orders that Ms. Pavlos-Hackney disobeyed is not before us: "the longstanding rule is that 'a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy.' " *In re JCB*, 336 Mich App 736, 747; 971 NW2d 705 (2021), quoting *United States v Rylander*, 460 US 752, 757; 103 S Ct 1548; 75 L Ed 2d 521 (1983) (alterations made by the *In re JCB* Court). It has long been established that even if a court's order is incorrect,[1] persons subject to the order must still comply with the order, and their remedy is to appeal the order or seek a stay. See *In re Contempt of Dudzinski*, 257 Mich App 96, 110-112; 667 NW2d 68 (2003). Indeed, even where a person is subjected to a "transparently unconstitutional" order, that person must still challenge the order through a proper appellate challenge (or at least a good-faith effort to do so) rather than simply disregard the order. *ARM v KJL*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket Nos. 357120, 358858, 358859), slip op at 7. Ms. Pavlos-Hackney knowingly, and very publicly, chose instead simply to disregard the orders. Nevertheless, all persons are entitled to due process. The issue before us is whether the contemnors received the due process to which they were entitled when the trial court imposed the contempts for violating the orders.

# II. BACKGROUND

Following the COVID-19 pandemic in 2020, Marlena's was subject to various administrative orders requiring the restaurant to comply with certain hygiene, social distancing, and masking requirements, including a prohibition against dine-in service. Throughout December of 2020 and January of 2021, the Allegan County Health Department and MDARD investigated Marlena's and determined that Marlena's was knowingly violating those requirements. Several administrative orders were issued, which Marlena's knowingly ignored. Finally, On January 20, 2021, MDARD entered an emergency summary suspension order that immediately suspended the food establishment license for Marlena's. On February 1, 2021, an administrative hearing was held regarding that suspension. Ms. Pavlos-Hackney "appeared as representative for" Marlena's. Ms. Pavlos-Hackney "sought to be represented by Richard Martin" but the request was denied because Martin "did not identify himself as an attorney licensed in Michigan." Nevertheless, she was permitted to call Martin as a witness. Following the hearing, it was determined that Marlena's was open for regular business in knowing and willful violation of the administrative orders. By Ms. Pavlos-Hackney's own testimony, she was fully aware of the orders and understood them. The suspension of the food establishment license for Marlena's was continued. The administrative

---

[1] We neither hold nor imply that any of the orders regarding COVID-19 precautions were improper in any way. Rather, we hold that it would be entirely irrelevant *even if* they were improper. Violation of a court order on the basis of sincerely-held beliefs is still a violation of a court order.

-2-

decision explained that Marlena's had a right to seek appeal by filing a petition in a court within 60 days. There is no indication that Marlena's made any effort to do so.

On February 24, 2021, approximately two weeks after the administrative decision, MDARD commenced this action by filing a complaint in the Ingham County Circuit Court. MDARD simultaneously filed an ex parte motion for a temporary restraining order. In both documents, MDARD largely recited the history of the dispute and the fact that Marlena's was continuing to operate its restaurant at great danger to public health, despite knowing of the orders and of its lack of a valid license. In its complaint, MDARD sought a permanent injunction against Marlena's selling food without a license. In its motion for a temporary restraining order, MDARD argued that an injunction was necessary to prevent irreparable harm to itself and to the public, it was likely to succeed on the merits because there was no serious dispute Marlena's was operating in violation of the law, and the potential harm to itself and to the public greatly outweighed the potential harm to Marlena's. The next day, the trial court entered a temporary restraining order under which Marlena's was "hereby ordered to cease operating a food service establishment and cease selling, distributing, or advertising food or beverages effective immediately." The order set a hearing date for March 4, 2021, via Zoom. The temporary restraining order was personally served "on Marlena Pavlos" the next day, February 26, 2021, at 6:37 a.m.

On March 1, 2021, MDARD moved to hold Marlena's in contempt, noting that the temporary restraining order had been immediately emailed to Ms. Pavlos-Hackney in addition to being personally served on her. However, MDARD had determined that Marlena's was violating the order, which MDARD confirmed by having one of its employees actually purchase food from Marlena's. That employee observed employees and patrons not wearing masks, even when not seated at tables. Another MDARD employee observed that Marlena's had made a post on Facebook recounting the restraining order and vowing neither to close nor to pay any fines or otherwise "comply with ANYTHING that violates my rights as an American citizen." MDARD further noted that Marlena's had "unilaterally ignored the temporary restraining order, just as it ignored MDARD's emergency suspension of its food establishment license," and Marlena's had not made any effort to appeal the suspension or the temporary restraining order. MDARD sought to have Marlena's held in contempt and subjected to a fine of $7,500 plus attorney fees in the "hope that a sanction less than imprisonment for civil contempt is sufficient to obtain compliance with [the] Court's order and the Food Law." MDARD also expressed the belief that the temporary restraining order "should be continued and converted into a preliminary injunction." Marlena's was served with a copy of the motion on March 2, 2021.

A hearing was held via Zoom on March 4, 2021. Ms. Pavlos-Hackney was present, and she confirmed that she was the owner of Marlena's. Ms. Pavlos-Hackney stated that she had retained Richard Martin as "assistance of counsel," and after repeated inquiries from the trial court whether Martin was an attorney, she admitted that she was not aware of whether Martin was licensed in Michigan or in any other state. She also indicated that she was not aware that a corporation was required to be represented by an actual attorney,[2] instead asserting that it was an

---

[2] Although corporate entities are technically entitled to represent themselves, they may only do so through agents who are otherwise licensed to practice law. *Detroit Bar Ass'n v Union Guardian*

act of treason for a judge to fail to comply with the Constitution.[3] The trial court suggested adjourning the hearing so that Ms. Pavlos-Hackney could obtain counsel, but when the trial court asked whether Ms. Pavlos-Hackney intended to retain counsel or "to rely upon the statement that you made earlier," Ms. Pavlos-Hackney replied "no comment." The trial court therefore chose to proceed. MDARD presented essentially a summary of the argument it made in its motion.

Ms. Pavlos-Hackney admitted that she did not have a license to operate Marlena's. The trial court asked Ms. Pavlos-Hackney whether Marlena's was still open, to which she replied "no comment" and "I do not consent and that they are in direct violation of well-established constitutional law." The trial court concluded that based on the evidence available and on the failure of Marlena's to obtain counsel, Ms. Pavlos-Hackney was aware that the license for Marlena's had been suspended and that she was willfully in violation of the court's order and of MDARD's order. The trial court entered an order holding Marlena's in contempt, ordering that Marlena's must pay $7,500, converting the temporary restraining order into a preliminary injunction, and ordering that "if [Marlena's] continues to operate a food establishment without a license, Marlena Pavlos Hackney shall be arrested and incarcerated until such time as she complies with the order of this Court." The trial court also issued a bench warrant for Ms. Pavlos-Hackney's arrest. The next day, MDARD confirmed that Marlena's was still open for business, based on a vow to remain open posted on Facebook and a telephone call to Marlena's, which stated that it

---

*Trust Co*, 282 Mich 707, 711-712; 281 NW 432 (1938); *Fraser Trebilcock Davis & Dunlap PC v Boyce Trust 2350*, 497 Mich 265, 276-277; 870 NW2d 494 (2015). Any individual may represent themself *in propria persona*, but only lawyers may represent another person or entity. *Shenkman v Bragman*, 261 Mich App 412, 416; 682 NW2d 516 (2004).

[3] "While the rights of private property are sacredly guarded, we must not forget that the community also have rights, and that the happiness and well being of every citizen depends on their faithful preservation." *Charles River Bridge v Warren Bridge*, 36 US 420, 548; 11 Ped 420; 9 L Ed 773 (1837). The police power of the states "extends, at least, to the protection of the lives, the health, and the property of the community against the injurious exercise by any citizen of his own rights." *Patterson v Kentucky*, 97 US (7 Otto) 501, 504; 24 L Ed 1115 (1878). Furthermore, "[t]hat a license may be revoked for failure to obey the provisions of the statute or ordinance under which such license is granted is too firmly established to be open to question." *Johnson v Figy*, 314 Mich 548, 565; 22 NW2d 893 (1946). It may, of course, be proper to challenge whether a particular implementation detail is arbitrary or unreasonable. See *Village of Euclid, Ohio v Ambler Realty Co*, 272 US 365, 395; 47 S Ct 114; 71 L Ed 303 (1926). However, as noted, the contemnors made no effort to do so. Otherwise, it is well established that state governments do not abuse their power purely because they require their citizens to curtail some preferred conduct or suffer some hardship in the interest of the public health, safety, and welfare. See *Nebbia v People of New York*, 291 US 502, 524-525; 54 S Ct 505; 78 L Ed 940 (1934). In Michigan, it has been established that although there is a general "right to engage in any business not harmful to the public . . . any business or business practice may be regulated if such regulation is necessary to the public welfare, health, morals and safety." *People v Victor*, 287 Mich 506, 512; 283 NW 666 (1939).

was open to take food orders.  Ms. Pavlos-Hackney was arrested "in the early morning hours of March 19, 2021."

The trial court, before an alternate trial judge because the assigned judge was unavailable that day, held an arraignment beginning at 1:35 p.m.  Earlier that day, Martin filed an appearance as "assistance of counsel" on behalf of Ms. Pavlos-Hackney.  At the commencement of the hearing, the trial court placed Martin under oath to confirm whether he had filed that appearance.  Martin, who admitted that he was not licensed to practice law in Michigan or any other state, cited the Sixth Amendment and "Sims v Aherns"[4] for the proposition that persons had a "right to assistance of counsel and that's anyone of your choice and that could be a bean picker that's learned at the law."  The trial court correctly informed Martin that he was wrong.  The trial court held Martin in

---

[4] This was presumably a reference to *Sims v Ahrens*, 167 Ark 557; 271 SW 720 (1925), a case in which the Arkansas Supreme Court addressed the propriety of Arkansas imposing an "occupation tax," which was in that case "an occupation tax and an income tax, because income derived from all pursuits or callings are taxed" and "no attempt is made to distinguish between occupations which are of common right and those which might be designated as privileges."  *Id*., 167 Ark at 562; 271 SW at 721.  The Arkansas constitution had a peculiar restriction on the state's power to impose taxes: Arkansas could not "tax occupations which are of common right for State purposes," but it could tax "those callings or pursuits which might be classed as privileges."  *Id*, 167 Ark at 565; 271 SW at 722.  The initial majority opinion concluded that the tax at issue violated the Arkansas constitution because it was not within the power of the Arkansas legislature "to declare and tax as privileges, for State revenue, pursuits and occupations which are matters of common right."  *Id*., 167 Ark at 572; 271 SW at 725.  On rehearing, a new majority recanted in part, and it concluded that "an income tax is neither a property tax nor a tax on occupations of common right, and that such a tax is not inhibited by the provisions of [the Arkansas constitution].  *Id*, 167 Ark and 586; 271 SW at 730.  However, it noted that an occupation tax was distinct from an income tax, because an occupation tax was a specific tax on the right to pursue a particular occupation irrespective of the income derived from that occupation, and the Arkansas constitution still prohibited taxes upon pursuits or occupations that are "matters of common right."  *Id*., 167 Ark at 594-595; 271 SW at 733.  Nowhere in the opinion is there any mention of attorneys or lawyers or the practice of law, and the only occupations specifically mentioned at issue were the manager of an insurance company, a landlord, a locomotive engineer, and a business merchant.  *Id*., 167 Ark at 561; 271 SW at 721.  Nevertheless, we are aware that some misguided individuals cite *Sims* for the erroneous claim that persons who are not licensed to practice law are nevertheless entitled to represent others—a proposition not found in *Sims*.  The context of *Sims* suggests that any such proposition would be nonsensical: *Sims* was fundamentally a taxation case, and even if there was some kind of "privilege of common right" to engage in the practice of law as an occupation, that would have no impact on whether that occupation may be otherwise regulated or conditioned upon licensure.  See *Engel v O'Malley*, 219 US 128, 137; 31 S Ct 190; 55 L Ed 128 (1911).  Finally, as an Arkansas case, *Sims* has no precedential value outside of Arkansas and is not binding on Michigan courts.

contempt, ordered him immediately arrested, and ordered him to pay $7,500.00. The trial court nevertheless advised Martin that he had a right to a hearing.[5]

Following Martin's arrest, Ms. Pavlos-Hackney attempted to address the court, saying "May I request to have the—," at which point the trial court cut her off, saying "I will address you. If you would like to go out of order, we'll start this 93 days from now." Following MDARD's attorney's appearance, the following exchange then occurred:[6]

> *The Court.* Ma'am, please raise your right hand. Do you swear or affirm the testimony you're about to provide will be the truth --

> *Ms. Pavlos-Hackney.* I would like to call --

> *The Court.* -- the whole truth and nothing but the truth under penalty of perjury?

> *Ms. Pavlos-Hackney.* I would like to call --

> *The Court.* Ma'am, ma'am, stop. I know you want to control this room, but this isn't Burger King. When the sign changes to Burger King, you can have it your way. Right now this is my courtroom, and you will answer my questions.

> *Ms. Pavlos-Hackney.* Under my 5[th] --

> *The Court.* Ma'am, stop. Do you promise to tell the truth, the whole truth and nothing but the truth under penalty of perjury? Yes or no. Are you going to tell the truth?

> All right, I'll take that as silence. I understand her attorney is on here. Where is her attorney?

> *Ms. Pavlos-Hackney.* He's in the jail back room.

---

[5] Later that day, the trial court entered a judgment of contempt against Martin for the unlawful practice of law without a license, stating that he must serve the full 93-day jail term and pay $7,500. At the ensuing hearing regarding Martin's contempt, the trial court was respectful and considerate despite its entirely-warranted ire. Ultimately, Martin was released from jail after 35 days and ordered to pay a mere $167.81, partly on the basis of his inability to pay the entire fine, in exchange for his acknowledgement that he had improperly held himself out as an attorney and a promise that he would never again try to practice law in Michigan or try to represent people in court. The trial court graciously took Martin at his word.

[6] As will be discussed below, the contemnors challenge the accuracy of the transcript from this hearing. We are referring to the amended version of the transcript.

*The Court.* Again, say anything again without telling me you're going to tell the truth, and I will hold you in contempt of court for 93 days. Now contempt carries with it 93 days and/or $7,500. You will not act disrespectful in this Court. Do you understand, ma'am?

You certainly may remain silent. Where is your attorney?

*Mr. Baker.* Your Honor, I'm on up here.[7]

*The Court.* Do we have the attorney on Zoom?

Sir?

*Mr. Baker.* We do, Your Honor. Yes.

*The Court.* Okay. Please state and spell your name for the record just so we know because you're on Zoom.

*Mr. Baker.* Robert Baker.

*The Court.* Sir.

*Mr. Baker.* Ah, B -- B-A-K-E-R, P-57964.

*The Court.* All right. Thank you.

So your client has elected to not be able to make a statement because she's not taking the oath. Do you wish to proceed or would you like to speak with her before we proceed?

Attorney Baker requested five minutes, which the trial court granted. The court went off the record for 25 minutes.

When the hearing resumed, the trial court confirmed that it had received Baker's appearance, and it also seemingly accepted Baker's explanation that Ms. Pavlos-Hackney did not previously understand the process and had been disconcerted. The trial court also noted for the record that two attorneys were present to serve as backup or advisory counsel, "because we were not sure that Defendant was going to have counsel." The trial court placed Ms. Pavlos-Hackney under oath, and Ms. Pavlos-Hackney stated that she had enough time to speak with her attorney. The hearing then proceeded as follows:

---

[7] "Up here" appears to be a reference to the fact that Baker appeared by Zoom, and the display screen for Zoom participants was mounted on a wall behind and above Ms. Pavlos-Hackney. We note that Baker *is* an attorney, and following his involvement as Ms. Pavlos-Hackney's legal counsel, the proceedings became more reasonable and orderly.

*The Court.* All right. So I have a Bench Warrant here, and it states, as I alluded to earlier but you hadn't been sworn so I'm going to reread it, Judge Stokes,[8] who you've been in front of who is actually is [*sic*] assigned to this case, I'm filling in because she is in judicial training and not available to be here today, she did sign this Bench Warrant on March 4th, 2021, and she asked that a Bench Warrant be issued and Ms. Marlena Pavlos-Hackney be held in contempt for the following reasons:

"Failing to abide by this Court's preliminary injunction. Ms. Marlena Pavlos-Hackney, shall be incarcerated until such time as she abides by this Court's Order."

I want to remind you, I do have it here, on March 4th, Judge Stokes signed an order, and it "prohibited Marlena's Bistro and Pizzeria from operating a food service establishment or selling, distributing or advertising food or beverage."

And she ordered that "You be held in Contempt of the February 25, 2021 Temporary Restraining Order and that you pay $7,500 because of that contempt."

She also ordered that the "February 25, 2021 Temporary Restraining Order is converted to a Preliminary Injunction which remains in effect and that Marlena's Bistro and Pizzeria is prohibited from selling, distributing or advertising food or beverages until further order of this Court."

Further, that "Marlena Pavlos-Hackney, as owner of Zante, Inc., doing business as Marlena's Bistro and Pizzeria was properly served with notice of Plaintiff MDARD's Summary Suspension Order, this Court's February 25, 2021 Temporary Restraining Order and Plaintiff MDARD's March 1st, 2021 Motion for Contempt.

She further ordered that if "Defendant Zante, Inc., doing business as Marlena's Bistro and Pizzeria continues to operate a food establishment without a license, Marlena Pavlos-Hackney shall be arrested and incarcerated until such time as she complies with the Order of this Court."

Do you understand what I just read?

*Ms. Pavlos-Hackney.* I am aware.

*The Court.* Counsel, are you waiving further arraignment?

---

[8] Judge Wanda Stokes was assigned to the case, but this hearing was held before Judge Rosemarie Aquilina.

*Mr. Baker.*  I am, Your Honor.

*The Court.*  Are we proceeding with a plea or the [*sic*] with a hearing?

*Mr. Baker.*  I would like time, Your Honor.  I just got on this case a little while ago.  I'd like to meet with my client properly.  She has agreed to comply with the Court Order until we have a contested hearing, if possible.

*The Court.*  Response on behalf of the People? [*sic*]

*Ms. Allison-Yokom [counsel for MDARD].*  Thank you, Your Honor.  As of this morning, it is our – based on information and belief of the Department, Marlena's continues to be open and serving customers and even after the point that she was arrested today.  So we do have concerns that there would be continued noncompliance.  There has been continued noncompliance now for several months.  The summary suspension was effective January 20th, 2021.  Today is March 18th (sic).  At no point during that time has she complied.

*The Court.*  I do have attached to what the People [*sic*] filed, an affidavit of support as well as a number of different pictures that do indicate that she has been operational.

So, sir, your client is entitled to a hearing.  However, I am holding her at this time in contempt pending a hearing.  She is going to be in lockup for 93 days and/or $7,500 [*sic*] and closing of the establishment.  So once she closes her establishment, which will be checked on frequently by the Attorney General, and she pays $7,500, she can be released from jail.  You can then prepare whatever it is you want for a hearing, for appeal, for what have you, but right now she is – based on the documentation that I have, she has violated the Orders of Judge Stokes, clearly violated them, and she has put the community at risk.  We are in the middle of a pandemic.  She's not followed the Orders of the Court which is a valid Court Order.  There is nothing here and no challenge to it having not been valid.  It's not been filed as a Motion for Reconsideration or any other tool that we have in the system where you can say it was an invalid Order.  So until it's removed, it's valid.

I've looked at the documentation.  I think Judge Stokes more than was patient and followed all of the steps, and I do find by clear and convincing evidence that she is in violation and the violation, by clear and convincing – I think there is some debate, pursuant to the case law, whether it's preponderance or clear and convincing.  But I have to say for this record I am clearly convinced that right now, today, this has remained open, and she has no intention of complying with the law.

The valid Court Order was meant to compel your client, you, ma'am, to follow the law and partner with society to protect yourself, to protect others, to protect the community, to protect those persons who work in your restaurant.  We are in the midst of a pandemic.  You have selfishly not followed the

Orders. You've not followed them for your own financial gain and apparently for the publicity that comes with this.

\* \* \*

We do not violate the law. I have no reason to believe that you are in compliance in any way, shape or form. And until that's proven at a hearing, you will be behind bars. You can assist your attorney after you close your restaurant and you pay the $7,500.

Should the restaurant open up again, there will be another Bench warrant issued immediately, another pickup order, 93 days and $7,500. I don't know how long you want to do this, ma'am, but we can keep doing it all year long. You must abide by the law.

Being a good citizen means that you act in accordance with the rights, duties, privileges and constitution that we all follow as American citizens. You have chosen to unilaterally violate those.

I'm continuing the Contempt Order. Counsel, you can certainly prepare with your client after she is released from jail, whether that be in 93 days or after she pays and closes the restaurant.

Baker then asked the trial court what would constitute adequate proof that the restaurant was closed, and the trial court explained that "As soon as the Attorney General is satisfied, the Court will be satisfied." At the conclusion of the hearing, the trial court released the attorneys present to be standby counsel, but noted that they would be reappointed if necessary because "I think clearly she needs counsel at every stage."

The trial court entered a judgment of contempt against "Zante, Inc / RA: Marlena Kartsch Pavlos / DBA Marlenas [*sic*] Bistro and Pizzeria" for failing to comply with the March 4, 2021, order. The latter contempt judgment specified that "DF MAY BE RELEASED EARLY UPON FULL PAYMENT OF $15000.00 AND UPON VERIFICATION of restaurant closure [*sic*, handwritten] AND FURTHER ORDER OF THE COURT." This judgment of contempt had a check-mark indicating that it was a civil contempt. A few days later, the originally assigned judge also entered an order holding that Marlena's was in contempt of the March 4, 2021, order, requiring Marlena's to pay $7,500 for that contempt and $7,500 for the original contempt, and ordering that Ms. Pavlos-Hackney was to remain incarcerated until it was proved that Marlena's was in compliance. Contemporaneously, the trial court entered another order holding that the entire $15,000 had been paid, and it had been determined that Marlena's was closed, so the contempt was purged and Ms. Pavlos-Hackney was to be released from confinement.

The contemnors then moved for relief from judgment, seeking to set aside the contempts entered following the March 19, 2021, hearing and for a refund of the $15,000. Their arguments are difficult to follow, but they generally alleged that the trial judge was abusive and violated the contemnors' constitutional rights, that the transcript from the hearing was erroneous for no specified reason, that defense counsel had been denied access to recordings of the hearing, that the

-10-

trial court lacked personal jurisdiction over Ms. Pavlos-Hackney, and that the $15,000 sanction exceeded the statutory limit of $7,500. The contemnors separately filed a motion seeking access to recordings of the March 19, 2021, hearing, citing YouTube videos demonstrating three verifiable transcription errors. They did not identify any other errors and instead argued generally that they had a right to a correct copy of the record. They sought access to recordings of the hearing and to correct the transcript. Two of the identified errors were in fact corrected in an amended transcript filed with the trial court shortly after the contemnors' motions. The other alleged error is that when the trial court asked "where is her attorney," Ms. Pavlos-Hackney supposedly identified attorney Baker by name instead of saying "he's in the back jail room."

The trial court agreed that any errors in the transcript should be corrected, but that the contemnors would need to identify those errors with specificity. Regarding access to an electronic recording of the hearing, the trial court pointed out that prior to the pandemic, hearings were not necessarily electronically recorded at all. Furthermore, the court recorder was a shorthand recorder who "transcribes from what she hears during" a hearing and then "operates from a written transcript; not from a video[,] [s]o she's not going back after the hearing and reviewing the video and then transcribing." Therefore, the amended transcript did not mean the court recorder had access to an electronic recording. Further, "before we even had the pandemic, we were transcribing hearings, you know, all day long, all week long, and they were accurate." Nevertheless, the trial court granted counsel time to identify specific substantive errors. Ultimately, the contemnors identified 37 errors that had been corrected in the amended transcript, and they claimed that "four[9] major errors remain[ed] uncorrected." The trial court asked how the contemnors had been prejudiced. Counsel's response was somewhat incoherent, but he argued that Ms. Pavlos-Hackney did not have a meaningful opportunity to prepare and mount a defense, and the contempt order was implemented without a hearing. The contemnors further argued that the fine should be refunded if the contempt had been civil, and they would have been entitled to greater protections if the contempt had been criminal.

In a thorough bench ruling, the trial court denied the contemnors' request for access to any electronic recordings the court might have of the March 19, 2021, hearing. The trial court had a local administrative order that specifically denied access to recordings. Furthermore, the trial court explained that transcripts are presumed to be accurate, and a party challenging that accuracy was required to identify any inaccuracies with specificity and explain how the inaccuracy was prejudicial. It explained that minor inaccuracies that were readily apparent from context were insufficient. The trial court also explained that most of the corrections to the amended transcript were typographical errors, and it was normal to "clean up the transcript afterwards because they're taking shorthand during the proceedings." The court noted that to the extent Ms. Pavlos-Hackney and the trial judge were speaking at the same time, it was Ms. Pavlos-Hackney's own fault that her words were lost, because the reporter would focus on the primary speaker. Finally, the trial court concluded that counsel had still not precisely identified the four allegedly outstanding major errors, although one of them had clearly been corrected. In any event, no showing had been made that

---

[9] We can only find three errors that the contemnors actually identified, apparently consisting of efforts to invoke the 5th or 6th Amendments and to identify attorney Baker.

any inaccuracies affected the contemnors' rights, as would be required by MCR 2.611(A)(1)(a), so the motion for access to video recordings or further changes to the transcript was denied.

Regarding the motion for relief from judgment, the trial court emphasized that the merits of suspending the food establishment license for Marlena's was not before it; the issue was the violation of an order to cease operations. Regarding personal jurisdiction, the key decisionmaker of a company may be held personally liable for the contempt of the company, irrespective of whether the decisionmaker was a party to the litigation or named in an order. Therefore, Ms. Pavlos-Hackney was subject to contempt sanctions for violations by Marlena's of a court order. The trial court found it clear that Ms. Pavlos-Hackney was aware of the orders, and she knowingly and willfully refused to comply with them, even announcing publicly that she would refuse to comply; "contempt is a consequence . . . plain and simple." Baker could have objected that he was not able to defend his clients, but he made no such objection and even affirmed that he had enough time to talk to Ms. Pavlos-Hackney. The substitute trial judge had clearly been concerned about ensuring that Ms. Pavlos-Hackney had legal representation, and it had not engaged in any improper questioning of Ms. Pavlos-Hackney. Furthermore, Ms. Pavlos-Hackney remained entitled to a hearing regarding the violations of the court orders. Finally, the contemnors had failed to clearly specify any alleged due process violations, and for the most part their "very generalized and conclusory" objections did not provide a basis for granting the motion.

The trial court went on to clarify the amount of the fine, explaining that $7,500 was imposed for the initial noncompliance with the court's order, and another $7,500 was imposed because Marlena's was still not in compliance on the date of the hearing: until Marlena's resolved the licensure issue, operating the restaurant was a violation of the court's order and punishable by contempt. The trial court also noted that counsel had made an argument about the contempt order being inappropriate because of how it was signed and filed, but if the court had followed "the 7-Day Rule," Ms. Pavlos-Hackney would have had to sit in jail for seven days, whereas she was actually released much sooner. The trial court therefore denied the motion for relief from judgment, other than preserving the right of Marlena's and Ms. Pavlos-Hackney to request a hearing. The contemnors filed a difficult to follow, although largely repetitive, motion for reconsideration, which the trial court denied. The underlying litigation was ultimately resolved by stipulation, and the contemnors never did request a hearing regarding their contempts. This appeal followed.

## III. STANDARD OF REVIEW

This Court reviews "for abuse of discretion a trial court's decision to hold a party or individual in contempt." *In re Contempt of Auto Club Ins Ass'n*, 243 Mich App 697, 714; 624 NW2d 443 (2000). In both criminal and civil proceedings, the default abuse of discretion standard recognizes that there may not be a single correct outcome, and if the trial court selects a "reasonable and principled outcome," this Court must "defer to the trial court's judgment." *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006) (internal quotations omitted). "A trial court's findings in a contempt proceeding are reviewed for clear error and must be affirmed on appeal if there is competent evidence to support them." *In re Contempt of Henry*, 282 Mich App 656, 668, 765 NW2d 44 (2009). This Court "may not weigh the evidence or the credibility of the witnesses" and may find clear error only if it "is left with the definite and firm conviction that a mistake was made." *Id*. at 668-669. "Whether a party has been afforded due process is a question of law,

-12-

subject to review de novo." *Id*. at 668. This Court also reviews de novo whether a contempt was civil or criminal, and it further reviews de novo the permissibility of the sanctions imposed. *In re Contempt of ACIA*, 243 Mich App at 714-716. It is irrelevant whether the trial court labels the contempt as civil or criminal. *Id*.

A criminal defendant's ability to obtain a complete transcript is generally considered a matter of due process. *People v Craig*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 357896), slip op at p 5 n 6. By implication, we think that a contemnor's ability to obtain an accurate transcript should likewise be considered a matter of due process. The correct application of the correct standard of evidentiary proof is also a due process concern. *Varran v Granneman*, 312 Mich App 591, 609-610; 880 NW2d 242 (2015). "Whether due process has been afforded is a constitutional issue that is reviewed de novo." *Elba Twp v Gratiot Co Drain Comm'r*, 493 Mich 265, 277; 831 NW2d 204 (2013). Only structural due process errors mandate automatic reversal; otherwise, due process errors are reviewed for harmlessness. See *People v Toma*, 462 Mich 281, 301 n 15; 613 NW2d 694 (2000). This Court reviews de novo whether the trial court has subject-matter jurisdiction, *Atchison v Atchison*, 256 Mich App 531, 534; 664 NW2d 249 (2003), and whether the trial court has personal jurisdiction, *Oberlies v Searchmont Resort*, Inc, 246 Mich App 424, 426; 633 NW2d 408 (2001). This Court likewise reviews de novo the interpretation of venue statutes and whether venue was properly laid in a particular trial court. *People v McBurrows*, 504 Mich 308, 312-313; 934 NW2d 748 (2019).

## IV. JURISDICTION

The contemnors argue that the trial court lacked subject-matter jurisdiction. However, the argument the contemnors actually present has nothing to do with subject-matter jurisdiction. The contemnors' argument is that the underlying action should have been commenced in Allegan County instead of Ingham County. Subject-matter jurisdiction refers to the power of a particular court to try a kind of case, generally without regard to the specific details of a particular case then pending; in contrast, venue refers to a geographic location deemed most convenient in which to hold a proceeding. *Grebner v Oakland Co Clerk*, 220 Mich App 513, 516; 560 NW2d 351 (1996). Thus, the contemnors present only a venue argument. Unlike subject-matter jurisdiction, a defect in venue may be waived and constitutes at most a mistake in the exercise of jurisdiction, rather than a lack of jurisdiction. *Edwards v Meinberg*, 334 Mich 355, 359; 54 NW2d 684 (1952). An objection to venue is waived if venue is not challenged by the time a defendant files an answer. MCR 2.221; MCL 600.1651; *Ovavez v Patrons' Mut Fire Ins Co*, 233 Mich 305, 308; 206 NW 503 (1925); *Bursley v Fuksa*, 164 Mich App 772, 776-779; 417 NW2d 602 (1987). We have not found any hint in the lower court record that a timely venue challenge was ever made, so it is not grounds for relief on appeal.

Regarding personal jurisdiction, it was never disputed that the trial court had personal jurisdiction over Marlena's; in fact, Marlena's explicitly conceded that it was subject to the trial court's personal jurisdiction. No challenge to the trial court's personal jurisdiction over Marlena's may now be made. See *Chapdelaine v Sochocki*, 247 Mich App 167, 177; 635 NW2d 339 (2001). Although "a corporation is a separate entity from its individual shareholders, officers, and directors . . . a corporation can only act through its officers and agents." *In re Moroun*, 295 Mich App 312, 332; 814 NW2d 319 (2012). Therefore,

[w]hen a court acquires jurisdiction over a corporation as a party, it obtains jurisdiction over the official conduct of the corporate officers so far as the conduct may be involved in the remedy against the corporation which the court is called upon to enforce. Courts will also disregard the separate existence of corporate entities when it is used to defeat public convenience, justify wrong, protect fraud, or defend crime. Because individuals who are officially responsible for the conduct of a corporation's affairs are required to obey a court order directed at the corporation, these same individuals may be sanctioned if they fail to take appropriate action within their power to ensure that the corporation complies with the court order. [*Id.* (quotation marks, citations, ellipses, and paragraph break omitted).]

The evidence unambiguously shows that Ms. Pavlos-Hackney was the owner of Marlena's and the person in charge of making decisions on behalf of Marlena's. Therefore, the trial court had personal jurisdiction to issue contempt orders against Ms. Pavlos-Hackney, personally, on the basis of any failure by Marlena's to comply with the court's orders. The contempts against Ms. Pavlos-Hackney were not void for lack of jurisdiction.

## V. DUE PROCESS FOR THE CONTEMPTS

The primary issue on appeal is whether the contemnors received all of the due process to which they were entitled when the trial court imposed the contempts. Although we conclude that the trial court erred in failing to specify that MDARD should be the recipient of the money sanctions, we conclude that the contemnors received all of the due process to which they would be entitled even if the contempts were criminal in nature.

## A. CIVIL OR CRIMINAL CONTEMPTS

Contempt is a "willful act, omission, or statement that tends to impede the functioning of a court," and "the primary purpose of the contempt power is to preserve the effectiveness and sustain the power of the courts." *In re Contempt of ACIA*, 243 Mich App at 708 (quotation, footnotes, and ellipsis omitted). Persons are required to obey orders of the court, even if those orders are clearly wrong and even if those orders are later determined to have been invalid. *In re Contempt of Dudzinski*, 257 Mich App at 110-112. "[C]ourts have two different forms of the contempt power at their disposal," either for coercion or for punishment, each of which has its own set of procedural requirements. *In re Contempt of ACIA*, 243 Mich App at 711. Either form of contempt may result in the contemnor being imprisoned, so both forms of contempt entitles the contemnor to some degree of due process; however, civil contempt requires fewer protections than criminal contempt. *Porter v Porter*, 285 Mich App 450, 456-457; 776 NW2d 377 (2009).

Civil contempt is generally imposed for the purpose of compelling the contemnor to comply with a court's order, and the contemnor has the ability to cure the contempt with that compliance. *In re Contempt of ACIA*, 243 Mich App at 711-712. Civil contempt may also serve the purpose of reimbursing a complainant who incurred costs because of the contempt; and, because it is considered avoidable and nonpunitive, civil contemnors are only entitled to "rudimentary" due process protections consisting of notice and an opportunity to present a defense. *In re Moroun*, 295 Mich App at 331-332. In civil contempt proceedings, "the party seeking

-14-

enforcement of the court's order bears the burden of proving by a preponderance of the evidence that the order was violated." *Porter*, 285 Mich App at 457. The violation may be merely neglectful rather than necessarily willful. *In re Contempt of United Stationers Supply Co*, 239 Mich App 496, 501; 608 NW2d 105 (2000). Although civil contempt may entail imprisonment, the contemnor must be able to avoid or end the imprisonment by complying with the original order. *In re Moroun*, 295 Mich App at 336. "[A] civil contempt proceeding may have a punitive, as well as remedial effect," but any imprisonment must be conditional until the contemnor complies with an order rather than for a specified term. *In re Contempt of Dougherty*, 429 Mich 81, 93-96; 413 NW2d 392 (1987).

In contrast, a criminal contempt serves to punish a contemnor for past misconduct, so it cannot be purged by any future conduct by the contemnor. *In re Contempt of ACIA*, 243 Mich App at 713. "[A] criminal contempt proceeding requires some, but not all, of the due process safeguards of an ordinary criminal trial." *In re Contempt of Dougherty*, 429 Mich at 91. In particular, a criminal contemnor is entitled to the presumption of innocence, protection from compelled self-incrimination, an adequate opportunity to prepare and present a defense, and a right to have the contempt proved beyond a reasonable doubt. *In re Contempt of ACIA*, 243 Mich App at 713-714. In contrast with a civil contempt proceeding, "a willful disregard or disobedience of a court order must be clearly and unequivocally shown and must be proven beyond a reasonable doubt." *DeGeorge v Warheit*, 276 Mich App 587, 592; 741 NW2d 384 (2007). "A defendant charged with contempt is entitled to be informed not only whether the contempt proceedings are civil or criminal, but also the specific offenses with which he or she is charged." *Id*.

The contempts in this matter stated on their face that they were civil. However, this is not dispositive. *In re Contempt of ACIA*, 243 Mich App at 714-716. The contempts have some punitive effect insofar as the contemnors were not issued a refund upon determining that Marlena's was truly closed. However, this is also not dispositive, especially because Ms. Pavlos-Hackney's imprisonment was explicitly conditional rather than for a fixed length of time. *In re Contempt of Dougherty*, 429 Mich at 93-96. The contemnors argue that the contempts were necessarily criminal because she was imprisoned only after she pledged to close the restaurant, and her release was conditioned upon MDARD verifying that the restaurant was closed, thereby depriving her of the "keys to her cell." The contemnors misapprehend the situation.

The first contempt order explicitly stated that Ms. Pavlos-Hackney would be fined immediately, arrested, and imprisoned until she complied with the court's order. She did not comply, and was not actually imprisoned at that time, nor did she pay the fine at that time. The second contempt order merely continued the previous sanction. Ms. Pavlos-Hackney was undisputedly still operating her restaurant at the time she was arrested, as she in fact admitted on the record.[10] She seemingly argues that she was in compliance with the court's order at the time she was incarcerated after the March 19, 2021, hearing, because the hearing ended at 2:38 p.m., and she claimed the restaurant closed at 2:00 p.m. However, the trial court reasonably interpreted

---

[10] Ms. Pavlos-Hackney argues that her statement that the restaurant closed at 2:00 was taken out of context. However, in making that argument, she relies on facts not in the record.

Ms. Pavlos-Hackney's statement as explaining that the restaurant normally closed at 2:00 p.m., so its closure at its normal closing time was not evidence of compliance with the court's order.

Before imposing coercive sanctions, trial courts must consider the probable efficacy of other possible sanctions, as well as the likely harm from continued disobedience. *In re Moroun*, 295 Mich App at 337. In light of Ms. Pavlos-Hackney's extensive history of vowing to disobey the court's orders, the trial court properly refused to accept Ms. Pavlos-Hackney's promise not to reopen. It was neither clearly erroneous nor an abuse of discretion for the trial court to find that Ms. Pavlos-Hackney could not be considered in compliance with the court's orders until it was conclusively shown that the restaurant would not reopen—and Ms. Pavlos-Hackney's own history of vowing to continue defying orders made her promise not to reopen worthless under the circumstances. We reject the contemnors' argument that the "keys to her cell" were handed over to MDARD merely because MDARD was charged with confirming that Marlena's had not reopened: the decision whether to reopen remained vested in Ms. Pavlos-Hackney. Furthermore, at least the first $7,500 fine had already been imposed in a clear effort to coerce Ms. Pavlos-Hackney into closing the restaurant; unlike incarceration, we are not persuaded that it is significant whether she actually *paid* the first fine when it was imposed. Under the circumstances, again keeping in mind Ms. Pavlos-Hackney's history of vowing to continue defying orders, the second fine also appears intended to be coercive. Therefore, we conclude that the contempts appear to have been civil in nature, as they stated on their faces and as *everyone* present clearly believed at the time.[11]

## B. ADEQUACY OF DUE PROCESS

Having concluded that the contempts were civil in nature, the contemnors were nevertheless entitled to "rudimentary" due process, which, as noted, consists of notice and an

---

[11] We therefore need not consider whether the contemnors received the due process to which she would be entitled for a criminal contempt. We note briefly, however, that there is absolutely no doubt the first contempt proceeding was civil, but to the extent there was any doubt about the second, the trial court's citation to the clear-and-convincing evidence standard, rather than the beyond-a-reasonable-doubt standard, would have been erroneous. Instructing a *jury* in a criminal trial as to an improperly low evidentiary standard is considered a structural due process error. *Sullivan v Louisiana*, 508 US 275, 276- 282; 113 S Ct 2078; 124 L Ed 2d 182 (1993). It is somewhat less obvious to us whether a trial judge's citation to an improperly low standard at a criminal contempt proceeding where the evidence is overwhelming could be reviewed for harmlessness. Trial judges are presumed to know the law, *People v Lanzo Constr Co*, 272 Mich App 470, 484; 726 NW2d 746 (2006), and the typical remedy where a trial court applies an incorrect legal standard is to remand for articulation of the correct standard, *In re Portus*, 325 Mich App 374, 397; 926 NW2d 33 (2018). Even if we found the contempts to have been criminal in nature, which we do not, we believe the proper remedy would not be to reverse the contempts or order the return the money, but to remand for the kind of hearing to which the trial court repeatedly told Ms. Pavlos-Hackney she was entitled.

opportunity to present a defense. *In re Moroun*, 295 Mich App at 331-332. Under that standard, the contemnors were undisputedly afforded adequate due process.

Notably, the fact that Ms. Pavlos-Hackney was not *actually* prepared to present a defense does not establish a due process violation. *DeGeorge*, 276 Mich App at 593-594. Ms. Pavlos-Hackney was amply aware of the nature of the charges against her: that she was operating Marlena's contrary to orders to cease operation. She was aware of the nature of the charges long before any of the hearings. She had ample opportunity to retain counsel, as shown by the fact that she successfully retained Martin, who was not even from Michigan. She was made aware at the administrative hearing—well before commencement of this action—that Martin was not authorized to practice law, and she had adequate time to secure real counsel in the meantime. As of the date of either the March 4 or March 19, 2021, hearings, Ms. Pavlos-Hackney was fully aware of the nature of the charges, she had ample time to prepare a defense and retain an attorney, and she simply chose instead to retain Martin and double-down on public defiance. Her arguments that she had little time to consult with Baker are nothing but a "red herring," especially because on the record, Baker affirmatively stated that he did have enough time to speak with his client. As the trial court observed, Baker could have objected, but he did not. Due process guarantees only an opportunity, and it is Ms. Pavlos-Hackney's own fault if she intentionally failed to avail herself of that opportunity.

We also question what legitimate defense the contemnors could possibly have raised. The contemnors would have needed to show that they were not in violation of the court's order, that it was impossible to comply with the court's order, or that a violation of the court's order had not been adequately established by the requisite quantum of proof. Even on appeal, Ms. Pavlos-Hackney never argues that she was in compliance with the court's order, and the evidence overwhelmingly shows that she was willfully and flagrantly violating the court's order all the way up to the point at which she was finally incarcerated. Even on appeal, the contemnors do not articulate what other kind of legitimate defense they might have raised given the opportunity to do so. Indeed, it appears that they did raise the only defense imaginable: immediate payment of the fine and a promise that the restaurant would not reopen the next day. Considering the nature of the contemptuous conduct and the surrounding context, it appears that the contemnors had adequate time and opportunity under the circumstances to prepare what defense they could.

Although the March 19, 2021, hearing was labeled an "arraignment," it is simply not possible for Ms. Pavlos-Hackney to have been ignorant of why she had been arrested and brought to court. The contemnors' argument that the case was not formally called is similarly meritless: according to the videos the contemnors provided, Ms. Pavlos-Hackney was already seated at the table marked "defendant." There was no plausible confusion about the nature or identity of the case being heard before the trial court. Despite repeated entreaties from the trial court, Ms. Pavlos-Hackney has utterly failed to explain how these issues had any possible prejudicial effect upon her. The record does not show that Ms. Pavlos-Hackney was compelled to testify against herself;

-17-

indeed, the trial court repeatedly emphasized that she had a right to remain silent.[12] The evidence before the trial court was more than adequate for each trial judge to independently conclude by a preponderance of the evidence that the contemnors violated orders of the court. *Porter*, 285 Mich App at 457.[13]

## C. PROPRIETY OF FINES

Having concluded that the contemnors received in full the due process to which they were entitled, we finally address the nature of the fines imposed by the trial court.

The contemnors argue that a $7,500 fine, let alone two such fines, would be an insurmountable hardship to many people. We agree. However, we note that when the trial court held a hearing regarding Martin's contempt, it reduced his fine on the basis of Martin's lack of actual ability to pay. Had Ms. Pavlos-Hackney ever requested a hearing, we fully trust the trial court would have similarly determined her ability to pay. Furthermore, in light of the courtesy and respect the trial court showed to Martin at his hearing, we have no doubt the trial court would have treated Ms. Pavlos-Hackney with similar courtesy and respect, especially as represented by an attorney. In any event, we find this argument disingenuous under the circumstances. Not only did the contemnors never seek any kind of hearing, the contemnors also tendered the full amount of the fine immediately. Accordingly, any argument about their ability to pay the fine is moot.[14]

Nevertheless, fines for civil contempts should, unless they are intended to compensate a complainant, be avoidable by the contemnor by complying with the court's order. See *Hicks on Behalf of Feiock v Feiock*, 485 US 624, 631-632; 108 S Ct 1423; 99 L Ed 2d 721 (1988). As noted, we find no particular significance to the date upon which the fine was actually paid. Therefore, the first fine of $7,500 is clearly not refundable, given the contemnors' subsequent willful and open continued defiance of the trial court's order.

The second $7,500 fine is a different matter. As discussed, the trial court unambiguously had no reason to trust Ms. Pavlos-Hackney. Therefore, it was certainly not erroneous for the trial court to incarcerate Ms. Pavlos-Hackney until the trial court could be certain Marlena's would not be reopened. Furthermore, we do not think it was improper for the trial court to have imposed the

---

[12] The substitute trial judge only chastised Ms. Pavlos-Hackney for speaking out of turn and for her contemptuous conduct itself.

[13] Indeed, although we need not reach the question, it appears improbable that the trial judges would have erred had they found that the violations were willful and had been proven beyond a reasonable doubt.

[14] We agree with our dissenting colleague that financial liquidity alone is not dispositive. However, we think it is important to consider the context: the contemnors *never even tried* to obtain a hearing regarding either of the contempts, even though they were invited to do so and clearly could have done so. By paying the fines and declining to raise an ability-to-pay challenge below, we doubt the "legal equity" (as our dissenting colleague puts it) of considering, at least in the context of this particular case, how much of a hardship the contemnors really suffered.

second fine as part of its efforts to compel the contemnors to comply with the court's orders. Nevertheless, it appears that Marlena's *was*, in fact, reasonably promptly closed thereafter. The trial court could not have known, at the time it imposed the second fine, that the contemnors would finally choose to comply. However, because the contemnors *did* finally choose to comply, it is unclear what more they could have done to avoid the second fine. Put another way, a civil contempt fine should generally be conditional or compensatory, but it is not clear what condition the contemnors failed to satisfy and the trial court did not direct any portion of the fine to be paid to MDARD. Rather, the ultimate effect of the second fine is more criminal than civil in nature, even if that was not the trial court's intent.

We conclude that the second fine must be remanded for the trial court to refashion it to be civil in nature, as applied under the circumstances.[15] We conclude that in so doing, the trial court must choose one of three options: (1) determine whether MDARD is entitled to reimbursement; (2) determine whether the contemnors sufficiently complied with the trial court's orders to be returned the second fine, in whole or in part; or (3) some combination of (1) and (2). The first option would, of course, require a factual determination of MDARD's expenditures as part of these enforcement proceedings.

## VI. ACCESS TO RECORDINGS AND ACCURACY OF TRANSCRIPT

Ms. Pavlos-Hackney generally contends that an accurate transcript is necessary to preserve her appellate and other post-judgment rights. All other things being equal, this is broadly true: "[w]here a defendant is able to make a colorable showing that inaccuracies in transcription have adversely affected the ability to secure postconviction relief, and such matters have seasonably been brought to the trial court's attention, the defendant is entitled to a remedy." *People v Abdella*, 200 Mich App 473, 475-476; 505 NW2d 18 (1993). Nevertheless, transcripts are presumed to be accurate. Id. at 475. To obtain relief on the ground that a transcript is inaccurate, a person must:

(1) seasonably seek relief; (2) assert with specificity the alleged inaccuracy; (3) provide some independent corroboration of the asserted inaccuracy; (4) describe how the claimed inaccuracy in transcription has adversely affected the ability to

---

[15] We respectfully do not understand why our dissenting colleague concludes that it is "blinkered" to individually analyze the propriety of the two distinct contempts. The first contempt was unambiguously intended to be coercive, and the contemnors nevertheless continued willfully defying the trial court's orders. Therefore, the first contempt fine was not compensatory in nature, and as such, there would be no need to consider MDARD's expenditures regarding that fine. In contrast, the contemnors reasonably promptly chose to comply with the trial court's orders following the second contempt, calling into question the extent to which the effect of the second fine ultimately proved more punitive than coercive. Therefore, regarding the *second* fine, it is necessary to consider how much of it should be reimbursed for the contemnors' compliance and whether some portion of it would still be properly imposed for compensatory purposes. We do not think it is "blinkered" to consider context.

secure postconviction relief pursuant to subchapters 7.200 and 7.300 of our court rules. [*Id*. at 476 (footnotes omitted).]

Furthermore, inaccuracies in the record are irrelevant "if the surviving record is sufficient to allow evaluation of the issues on appeal," and "[w]hether the record is sufficient depends upon the question asked of it." *Elazier v Detroit Non-Profit Housing Corp*, 158 Mich App 247, 249-250; 404 NW2d 233 (1987).

We need not address the first three elements, because the contemnors simply fail to articulate how they have been prejudiced. The contemnors only identify two remaining alleged errors, both of which pertain to Ms. Pavlos-Hackney's supposed efforts to identify Baker before Baker identified himself. Presuming, without deciding, that those alleged errors are real, it is not apparent how the contemnors were prejudiced by any such error: either way, the trial court was uninterested in what Ms. Pavlos-Hackney had to say until her attorney had been identified, and Baker did identify himself moments later.

Otherwise, the contemnors only provide vague concerns that their appellate rights might be impeded or that other errors might still be present in the transcript. Regarding the former, the contemnors' failure to articulate how they have been deprived of post-appellate relief, especially in light of our actual consideration of the matter, precludes further relief. See *Mitcham v City of Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). Regarding the latter, the transcript is presumed to be accurate, and if the contemnors or their attorney (who participated by Zoom and could have recorded the hearing) believed any specific errors were present, they could corroborate those errors by providing affidavits of witnesses or by showing that the transcript as written makes no sense. See *Abdella*, 200 Mich App at 476 n 2. It is insufficient to make a bare assertion that there *might* be an error. See *Craig*, ___ Mich App at ___, slip op at p 7. In other words, the contemnors are not entitled to a "fishing expedition," which is all the contemnors have articulated. As discussed, captioning the transcript as an "arraignment" is irrelevant. The contemnors argue that the amended transcript "lacked a proper or updated certification," which is obviously disproved by simply looking at the certifications found at the ends of both the original and the amended transcripts. In short, the contemnors have not shown that any non-trivial inaccuracies existed or that there was any basis for granting them access to an electronic recording of the hearing, if such a recording even existed.

We remand for the trial court to refashion the second civil-contempt fine of $7,500 consistent with this opinion. In all other respects, we affirm. We do not retain jurisdiction. Because neither party has prevailed in full, we direct that the parties shall bear their own costs on appeal. MCR 7.219(A).

/s/ Amy Ronayne Krause
/s/ Kristina Robinson Garrett

-20-